IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BOHLER ENGINEERING PA, LLC and BOHLER ENGINEERING, P.C., | ) ) ) | |
| Plaintiffs, | ) ) | Civ. Action No. |
| v. | ) ) ) | |
| GEORGE CRESSMAN, MAXIMILIANO BUSTOS, and and KIMLEY-HORN AND ASSOCIATES, INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## VERIFIED COMPLAINT

Plaintiffs, Bohler Engineering PA, LLC ("Bohler PA") and Bohler Engineering, P.C. ("Bohler PC") (collectively "Bohler" or "Plaintiffs"), file this Verified Complaint against Defendants, George Cressman ("Cressman"), Maximiliano Bustos ("Bustos"), and Kimley-Horn and Associates, Inc. ("Kimley-Horn") (collectively "Defendants"), alleging as follows:

## NATURE OF THE ACTION

1.      Bohler brings this action against Bohler PA's former Business Development/Senior Project Manager, Cressman, and against Bohler PA's former Design Engineer, Bustos – who have misappropriated confidential business information and trade secrets and accepted employment with a direct competitor, Kimley-Horn.  In addition to violating state and federal statutory and common law, Cressman's and Bustos's offending actions violate a number of contractual restrictive covenants that they signed and agreed to in consideration for their employment with Bohler PA.  Kimley-Horn, a direct competitor of Bohler, and the new employer of Cressman and Bustos, is likewise liable for misappropriation of Bohler's confidential business and trade secret

1

information, and for other unlawful conduct, as Cressman disclosed misappropriated information to Bustos and at least another former Bohler PA employee now employed by Kimley-Horn under circumstances that they knew or reasonably should have known such confidential and trade secret information was unlawfully disclosed to them by Cressman in furtherance of their now apparent plan to unfairly compete with Bohler.

2.    In light of the fact that Cressman was a Bohler PA Associate at times relevant to the claims asserted in this Complaint, and because he served as Bohler PA's trusted Business Development/Senior Project Manager, which allowed him (subject to contractual, fiduciary and other loyalty duties) frequent access to and use of Bohler's confidential information and trade secrets, as well as regular and repeated personal dealings with numerous Bohler clients and prospects, throughout his employment with Bohler PA, Cressman is in a unique position to leverage – for his personal gain and benefit and the gain and benefit of Kimley-Horn – both the goodwill that Bohler has developed with its customers and the unfair advantage of competitive use of Bohler's confidential business and protected trade secret information.

3.    Under these facts and circumstances, and those set forth below, Plaintiffs seek this Court's assistance to, among other things, issue immediate injunctive relief to avoid irreparable harm.  Specifically, Bohler seeks temporary, preliminary and permanent injunctive relief, among other relief, enjoining Defendants and any Kimley-Horn employees or other agents who have received, directly or indirectly, any Bohler confidential information or trade secrets from (a) retaining, using, or disclosing any of Bohler's confidential information or trade secrets, (b) pursuing or accepting any opportunity identified using Bohler's confidential information/trade secret information; and (c) contributing to or participating in any manner in efforts by Kimley-Horn to solicit or service any customer/project/opportunity that are the subject of any

misappropriated confidential information or trade secrets. Additionally, Plaintiffs seek to restrain and enjoin Defendants Cressman and Bustos from otherwise violating the terms of their respective post-employment restrictive covenants.

**PARTIES**

4.      Bohler is engaged in the business of providing engineering consulting and technical design services to developers and their partners in many states including Pennsylvania.

5.      Bohler PC is a New Jersey-based engineering firm that in addition to operating its own engineering and related services business provides administrative support to its various affiliates operating in Pennsylvania and a number of additional states in the United States.

6.      Bohler PA is a limited liability company organized under the laws of the Commonwealth of Pennsylvania with several locations in Pennsylvania, including one located at 1515 Market Street, Suite 920, Philadelphia, PA 19102.

7.      Cressman is a former employee of Bohler PA whose employment with Bohler began on or about February 14, 2014 and ended on or about July 18, 2018.

8.      Upon information and belief, Cressman is a resident of Montgomery County, PA with a residence located at 612 Brookwood Lane, North Wales, PA 19454.

9.      Bustos is a former employee of Bohler whose employment with Bohler began on or about September 29, 2014 and ended when he voluntarily terminated his employment with Bohler on or about July 6, 2018.

10.     Upon information and belief, Bustos is a resident of Philadelphia County who resides at 228 Pine Street, Philadelphia, PA 19106.

11. Upon information and belief, Kimley-Horn is a North Carolina corporation registered to do business in Pennsylvania engaged in the business of providing engineering consulting services in many states, including Pennsylvania.

12. Upon information and belief, Kimley-Horn's principal place of business is located at 421 Fayetteville Street, Suite 600, Raleigh, NC 27601.

13. Upon information and belief, both Cressman and Bustos are presently employed by Kimley-Horn's Philadelphia office located at 50 South 16th Street, Two Liberty Place, Suite 1650, Philadelphia, PA 19102.

## JURISDICTION AND VENUE

14. This Court has both personal and subject matter jurisdiction over Defendants in this civil action in which Bohler seeks, among other relief, temporary, preliminary and permanent injunctive relief enjoining Defendants from, among other things, retaining, using, or realizing a commercial benefit from their misappropriation of Bohler's confidential information and trade secrets and Defendants Cressman and Bustos from further violating the terms of their respective post-employment restrictive covenants.

15. The alleged harm and breaches occurred, among other places, in the Eastern District of Pennsylvania.

16. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1367 because Bohler asserts a cause of action under federal law pursuant to the Defend Trade Secrets Act ("DTSA"), Publ. L. No. 114-153, 130 Stat. 376.

17. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the state law claims alleged herein.

4

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to these claims occurred in the Eastern District of Pennsylvania.

## FACTUAL BACKGROUND

19.    Bohler is a nationwide engineering design firm that offers consulting and technical design services in many areas, including, by way of example, site civil engineering, land surveying, program management, landscape architecture, sustainable design, development services, permitting assistance, and facilities engineering.

20.    As of July 23, 2018, Bohler PA employs approximately twenty-one (21) people at its Philadelphia location.

**Cressman's Employment Agreement with Bohler**

21.    George Cressman was hired by Bohler PA on or around February 14, 2014.

22.    During his employment with Bohler PA, Cressman was placed in a position of trust and confidence where he was entrusted with confidential business and protected trade secret information and where he developed and maintained valuable customer relationships and goodwill on behalf of Bohler.

23.    Therefore, as a condition of his employment, Cressman signed and agreed to an Agreement Concerning Employment, Confidentiality, Non-Solicitation and Non-Competition (the "Employment Agreement").

24.    A true and accurate copy of the Employment Agreement is attached hereto as **Exhibit A** and incorporated herein by reference.

25.    The Employment Agreement expressly states, and Cressman agreed, that he would be privy to confidential information "not generally known to the public as compared to general

5

industry knowledge or practice," and that Cressman owed an "undivided duty of loyalty to [Bohler] during [his] employment."

26.     The Employment Agreement contains certain restrictive covenants including, *inter alia*, non-competition, non-disclosure, and non-solicitation provisions that are designed to protect Bohler's legitimate business interests in its special customer relationships, and associated goodwill, and the confidential business and trade secret information that employees are entrusted with in the performance of their job duties.

27.     For example, under Paragraph 4 of the Employment Agreement, Cressman agreed to protect Bohler's confidential information and trade secrets from disclosure and that he would not disclose such information after his employment with Bohler for a period of five (5) years.

28.     Cressman further agreed that he would not disclose information about his experience, qualifications, or special knowledge or personal characteristics of any Bohler employees for three (3) years following the termination of his employment.

29.     Additionally, Cressman agreed under Paragraph 4 to notify Bohler of any unauthorized use of confidential information.

30.     Under Paragraphs 5(a) and (b) of the Employment Agreement, Cressman agreed that he would refrain from prohibited solicitation of any Bohler PA "Client or Solicited Prospect" or of any "Customer or Prospective Customer" of the Company, respectively, for a period of twenty-four (24) months following the termination of his employment.

31.     Under Paragraphs 5(c) and (d) of the Employment Agreement, Cressman agreed that he would not request, encourage, influence, or induce, directly or indirectly, any "Client or Solicited Prospect" of Bohler PA, or any "Customer, Prospective Customer, or any other Person sharing a business relationship with the Company", respectively, to curtail, cancel, modify, or

6

otherwise change their business relationship with Bohler PA or the Company, respectively, or to otherwise interfere with or disrupt such business relationships.

32.    Under Paragraph 5(e), Cressman agreed that he would "not perform any work or services in the Company Business in the Restricted Area for any Client or Solicited Prospect of [Bohler PA] in any capacity in which [he] provide[s] or oversee[s] functions that could benefit from [his] knowledge of the Confidential Information of [Bohler PA] or the Company. . ." for a period of two (2) years.

33.    Under Paragraph 6 of the Employment Agreement, Cressman agreed not to disparage Bohler.

34.    Cressman agreed under Paragraph 7 of the Employment Agreement to return all company property upon the termination of his employment.

35.    Also, under Paragraph 14 of the Employment Agreement, Cressman agreed that he was a trusted employee of Bohler and any violation of the Employment Agreement would cause Bohler irreparable harm, entitling Bohler to injunctive and equitable relief against him.

36.    Cressman also agreed under Paragraph 14(d) that Bohler is entitled to recover its reasonable attorneys' fees and costs arising from any successful legal proceeding to enforce or interpret the terms of the Employment Agreement.

37.    Paragraph 18(h) contains a choice of law provision whereby Cressman agreed that the Employment Agreement would be governed by New Jersey law.

**Cressman's Employment with Bohler**

38.    After signing and agreeing to the Employment Agreement, Cressman worked for Bohler PA for over three (3) years in the position of Business Development/Senior Project Manager and then, in July 2017, Cressman was promoted to the position of Associate (i.e., the

highest employment position other than Principal and one responsible for business development, preparing and communicating bids and proposals to clients and prospective clients, direct and regular interaction with clients and prospective clients, and managing the work of a number of directly reporting design engineers).

39.    Cressman's varied job duties at Bohler PA included, by way of example, networking and cross marketing with other Bohler offices, introducing Bohler into new markets, acquiring new service contracts, attending business development events on Bohler's behalf, coordinating business development strategies, researching potential clients, meeting with existing clients, vendors, and sub-consultants, work developing internal Bohler strategies, managing the civil engineering process, participating in site investigations and due diligence, preparation of concept drawings, proposals, RFP's, and construction cost estimates, project coordination, collection of accounts receivables, and profit evaluations.

40.    As is apparent from his job duties as Business Development/Senior Project Manager, during the course of his employment at Bohler PA, Cressman was entrusted with Bohler's trade secrets and confidential information including client lists, prospective client lists, sensitive financial, project, and proposal data, and Bohler internal and project specific strategies and proposals.

41.    The compilation of such valuable business information acquired over the course of Cressman's more than four (4) years' employment with Bohler is confidential and trade secret information that is not readily available to the public and such information was gained by Cressman only as a result of his employment at Bohler.

42.    The customer relationships and associated goodwill that Cressman developed on behalf of Bohler, and his unique access to and knowledge of Bohler's confidential information and trade secrets amount to legitimate business interests that Bohler is entitled to protect.

43.    As a result of Cressman's special relationships with Bohler customers and potential clients, associated goodwill, and his unique knowledge of and access to Bohler's confidential information and trade secrets, absent any restrictions on him, Cressman and his current employer Kimley-Horn have the ability to use such relationships and confidential information and trade secrets to gain an unfair advantage in future competition with Bohler and to irreparably harm Bohler.

**Bustos's Employment Agreement**

44.    During his employment with Bohler PA, Bustos was increasingly placed in a greater position of trust and confidence where he was over time entrusted with confidential business and protected trade information of Bohler.  His responsibilities and expectations changed over time and, as part of the continuing growth of his position, he continued to have more client exposure.  Accordingly, in August 2017, Bustos signed and agreed to a Confidentiality and Non-Disclosure Agreement (the "Confidentiality Agreement"), as a condition of continued employment in such capacity.

45.    A true and accurate copy of the Confidentiality Agreement is attached hereto as **Exhibit B** and incorporated herein by reference.

46.    Under the Confidentiality Agreement, Bustos agreed to keep confidential all trade secrets and confidential information of Bohler that he acquired as a result of his employment there.

47.     The Confidentiality Agreement contains certain restrictive covenants, including a provision that restricts post-employment use of confidential information obtained during Bustos's employment at Bohler.

48.     For example, under Paragraph 3(a) of the Confidentiality Agreement, Bustos agreed to protect Bohler's confidential information and trade secrets from disclosure and that he would not disclose such information during his employment and thereafter for a period of five (5) years.

49.     Additionally, Bustos agreed in Paragraph 3(c) to notify Bohler of any unauthorized use or disclosure of confidential information and to "cooperate with [Bohler] in every reasonable way to help [Bohler] regain possession of such Confidential Information and prevent its further unauthorized use and/or disclosure."

50.     Under Paragraph 4 of the Confidentiality Agreement, Bustos agreed not to disparage Bohler.

51.     Bustos agreed under Paragraph 5 of the Confidentiality Agreement to return all company property upon the termination of his employment with Bohler.

52.     Also, under Paragraph 6 of the Confidentiality Agreement, Bustos agreed that he was a trusted employee of Bohler and any violation of the Confidentiality Agreement would cause Bohler irreparable harm, entitling Bohler to injunctive and equitable relief against him.

53.     Bustos also agreed under Paragraph 8 that Bohler is entitled to recover its reasonable attorneys' fees and costs arising from any successful legal proceeding to enforce or interpret the terms of the Confidentiality Agreement.

**Bustos's Employment with Bohler**

54.     Bustos was hired on September 29, 2014 and worked in the position as Design Engineer.  On December 12, 2015, he was promoted to Mid-Level Design Engineer.

55.     Bustos's job duties at Bohler PA included, by way of example, zoning reviews, site investigations and due diligence, preparation of concept drawings, grading design analysis, design of utility systems, soil erosion design and control, project coordination, and collaboration directly with clients for at least one (1) year.

56.     As Design Engineer, during the course of his employment at Bohler PA, Bustos was entrusted with Bohler's trade secrets and confidential information, including, by way of example, client lists, prospective client lists, sensitive financial data, Bohler internal strategies, and unique Bohler design concepts.

57.     The compilation of such valuable business information acquired over the course of Bustos's employment with Bohler is confidential information that is not readily available to the public and such information was gained by Bustos only as a result of his employment at Bohler.

58.     The customer relationships and associated goodwill that Bustos developed on behalf of Bohler, and his unique access to and knowledge of Bohler's confidential information and trade secrets amount to legitimate business interests that Bohler is entitled to protect.

59.     On or about June 25, 2018, Bustos gave notice to Bohler that his last day of employment would be July 6, 2018.

60.     On July 6, 2018, Bohler sent a letter to Bustos reminding him of his continuing contractual and common law obligations of confidentiality and non-disclosure.

61.     A true and correct copy of the July 6, 2018 letter to Bustos is attached hereto as **Exhibit C** and incorporated by reference as if fully set forth herein.

11

62.     As a result of Bustos's relationships with Bohler customers and potential clients, associated goodwill, and his unique knowledge of and access to Bohler's confidential information and trade secrets, absent any restrictions on him, Bohler and his current employer Kimley-Horn have the ability to use such relationships and confidential information and trade secrets to gain an unfair advantage in future competition with Bohler and to irreparably harm Bohler.

63.     On or around July 9, 2018, upon information and belief, Bustos began a position at Kimley-Horn.

**Cressman's and Bustos's Actual and Threatened Breach of Their Post-Employment Restrictive Covenants**

64.     Armed with the ability to unfairly use Bohler's goodwill, confidential information, and trade secrets, upon information and belief, Cressman and Bustos have breached, and absent the issuance of immediate injunctive relief, will continue to breach their respective Bohler agreements.

65.     On or around July 9, 2018, Cressman gave notice to Bohler that his last day of employment would be on July 20, 2018.

66.     After giving notice of his intent to end his employment at Bohler, but before he left his employment, Cressman prepared and showed to Rob Irons, a Principal of Bohler, a markup of a master Bohler Project List, which reflected the active Bohler client projects and proposals for which Cressman reported he was involved with at the time and detailed confidential business information pertaining to each. For example, the list identifies the name of the client, the project title, a unique Bohler project identification number, the Bohler Project Manager, and the amount of money that has been billed toward services Bohler performed.

67.     Cressman sought permission from Bohler to bring with him to Kimley-Horn the items marked with a "C" on Cressman's Project List markup. Cressman suggested that he continue

to work on the items marked with a "B" as a consultant after his departure. Bohler definitively told Cressman "no" to both requests for the "B-" and "C-" marked projects and proposals.

68.     Cressman's Project List markup is incorporated herein by reference and a redacted version is attached hereto as **Exhibit D**.[1]

69.     From about 11:40 AM to 12:10 PM, on July 18, 2018, Bohler's Chief Legal Counsel met with Cressman to discuss, among other things, what was required of Cressman under his Employment Agreement following termination of his employment because, after Cressman provided his Project List markup to Rob Irons, Bohler discovered that Cressman was already violating certain contractual obligations with respect to nondisclosure of confidential and trade secret information.

70.     Shortly after meeting with Bohler's Chief Legal Counsel, at 3:46 p.m. on July 18, 2018, Cressman emailed an update on the status of all active Bohler projects and proposals to Cornelius Brown, Bohler's head of its Philadelphia office.

71.     Shockingly, at 3:49 p.m. on July 18, 2018, Cressman also emailed the highly confidential Project List markup to Cressman's personal email account with a blind carbon copy sent to Max Bustos's personal email account.

72.     The 3:49 p.m. email from Cressman to his personal email account and to Max Bustos's personal email account is incorporated by reference. A redacted copy is attached hereto as **Exhibit E**.

73.     The Bohler information that Cressman misappropriated included, without limitation, client names, client lists, profit margins, contractors, civil engineering designs and

---

[1] For confidentiality reasons, Exhibits D and E are redacted; however, the individually named Defendants are believed to possess misappropriated copies of these documents and Plaintiffs will present unredacted copies to the Court *in camera*.

specifications, pricing information for Bohler Services, projects, project concepts, and internal firm strategies, all of which individually and collectively constitutes trade secrets and proprietary confidential information (hereinafter "Trade Secrets and Confidential Information").

74.     These Trade Secrets and Confidential Information were generally not known outside Bohler.  Bohler employee laptops, as well as remote access to the Bohler network, is encrypted from point to point, and Bohler's off-site local storage systems use military-grade encryption.

75.     These Trade Secrets and Confidential Information are password-protected as Bohler requires employees to set a complex password and to change it every ninety (90) days.

76.     Within Bohler, these Trade Secrets and Confidential Information were only discreetly disclosed in a piecemeal fashion and as-needed basis based upon an employee's position at Bohler.

77.     As demonstrated, Bohler takes reasonable precautions to maintain the secrecy of its Trade Secrets and Confidential Information by requiring employees with access to Trade Secrets and Confidential Information to sign confidentiality, non-disclosure, (and in certain warranted circumstances) non-compete agreements, and by taking other reasonable precautionary measures like those listed by way of example in the preceding paragraphs.

78.     These Trade Secrets and Confidential Information were and are competitively valuable information.

79.     Upon information and belief, Cressman and Bustos accessed, misappropriated, and/or received Trade Secrets and Confidential Information through emailing or receiving information on their personal email accounts.

80.    More specifically, Cressman and Bustos have misappropriated confidential and trade secret information both during their employment with Bohler and after their employment ended by, among other things, emailing confidential and trade secret information from the Bohler company system to and from each other at various non-Bohler email addresses, including, by way of example:

a.    On or about June 19, 2018, Cressman forwarded an email from his Bohler account to his personal account that set forth an in-depth project proposal that was sent to a Bohler client but, upon information and belief, the proposal was not signed by the client nor was work started by Bohler.

b.    On or about Sunday, July 8, 2018, before Cressman gave notice of his last day at Bohler, Cressman sent an email from his Bohler account to his personal account attaching a .pdf copy of the Operational Excellence Scorecard, which contains confidential business and business development metrics and goals for Bohler.

c.    On or about July 9, 2018, the same day Cressman gave notice of his last day at Bohler, Cressman sent an email from his Bohler account to his personal account attaching a prospective client list prepared for Bohler by a consultant.

d.    Also on or about July 9, 2018, Cressman sent an email from his Bohler account to his personal account attaching an Excel spreadsheet version of Bohler's Operational Excellence Scorecard.

e.   On or about July 12, 2018, Cressman emailed a Bohler project proposal and other confidential business information to Anthony Caponigro[2] at his then-competitor, Kimley-Horn, and to Max Bustos to aid in Cressman's efforts (a) to compete with Bohler for this business opportunity identified during his employment with Bohler, and (b) to transition one or more business opportunities to Cressman's new prospective employer, Kimley-Horn;

f.   Also on July 12, 2018, Cressman forwarded to Bustos information about a business development event and said, "[t]his may be something to go to?"

g.   On July 16, 2018, Cressman emailed CAD Survey files for two projects to Streamline and bcc'd Max Bustos;

h.   On July 17, 2018, Cressman emailed an existing Bohler client while still employed by Bohler following up on a personal interaction the prior day and asking to schedule lunch in the next week or two to discuss a "new opportunity" and "moving forward";

i.   On or about July 18, 2018, Cressman accessed Bohler's computer and/or network to obtain confidential retainer account activity history for another existing Bohler client regarding an existing Bohler project and emailed the same to the client in furtherance of already initiated efforts to compete for next phases of the project for the benefit of competitor Kimley-Horn; and,

---

[2] Anthony Caponigro is a former Bohler employee who currently is employed at Kimley-Horn. When Anthony Caponigro's employment ended at Bohler, he was dishonest about where he was going to be employed next, making the disclosure of such information to him all the more of a threat.

j.  Also, on July 18, 2018, Cressman sent an email from a Bohler email account to his and Bustos's personal email accounts, which included a master list of all Bohler upcoming projects.

81.   Upon information and belief, on July 23, 2018, Cressman began a position at Kimley-Horn in a manner that violates certain of the post-employment restrictive covenants in his Employment Agreement.

82.   Cressman and Bustos knew or reasonably should have known that such actions were improper, illegal, and in violation of agreements each had signed with Bohler.

83.   As employees of Bohler PA, Cressman and Bustos were exposed to confidential and proprietary information of Bohler.

84.   Cressman and Bustos owe certain duties to Bohler related to their knowledge of Bohler's confidential business information under contract and applicable law.

85.   In addition, Cressman owes Bohler a fiduciary duty, as his position at Bohler was that of trusted advisor and he enjoyed a unique position of trust and confidence with respect to access to Bohler's confidential and trade secret information and frequent, close dealings with Bohler clients.

86.   Upon information and belief, Kimley-Horn is aware of the value of Cressman's knowledge of and access to Bohler's confidential client information, goodwill, and trade secrets. Under these circumstances, Bohler reasonably believes that Kimley-Horn has hired Cressman specifically because such knowledge and relationships can be used by Cressman to provide Kimley-Horn with an unfair competitive advantage and/or Kimley-Horn has knowledge of Cressman's misappropriation of Bohler's trade secret and confidential information and of his

disclosure of such information to one or more Kimley-Horn employees – even while Cressman was still employed by Bohler PA.

87.    Unless Cressman is prohibited from violating his Employment Agreement, and unless Bustsos is prohibited from violating his Confidentiality Agreement, Bohler will suffer immediate irreparable harm.

88.    For example, if any of Bohler's confidential information is used or disclosed by Cressman or Bustos, its value will be damaged and Kimley-Horn will be better able to solicit Bohler's clients and unfairly compete with Bohler.  Moreover, if Cressman uses his special relationships and associated goodwill with Bohler's customers that he cultivated on behalf of Bohler, Bohler risks losing its client relationships and goodwill to Kimley-Horn.

89.    Upon information and belief, as a further example, Cressman's current employment with Kimley-Horn is already in direct violation of the Employment Agreement and is causing, or will cause, Bohler the loss of fair competition.

90.    While Bohler has suffered at least nominal damages by the conduct described above, it will be difficult, if not impossible, to reasonably calculate all of the damages Bohler will suffer as a result of such unlawful conduct and the loss of fair competition.

91.    Absent intervention by the Court, Bohler will be irreparably harmed and the value of its confidential client information, customer relationships, goodwill, and trade secrets will continue to be at risk and subject to possible dissemination and loss.

## COUNT I
## BREACH OF CONTRACT
### (Cressman and Bustos)

92.    Bohler incorporates by reference its allegations in the foregoing paragraphs as if fully set forth herein.

93.    Upon information and belief, Cressman and Bustos have breached their respective Employment and Confidentiality Agreements with Bohler.

94.    Upon information and belief, Cressman has breached and violated his Employment Agreement, *inter alia*, as follows:

   a. Cressman breached paragraph 4(b) of his Employment Agreement by disclosing and/or using Bohler's confidential information to Bustos and at least one other former Bohler employee who now also is employed at Kimley-Horn;

   b. Cressman breached paragraph 4(d) of his Employment Agreement by failing to notify the appropriate Bohler personnel of his actual knowledge of his and Bustos's unauthorized use or disclosure of Bohler's information;

   c. Cressman breached paragraph 4(e) of his Employment Agreement by using and/or copying any data or information on any Company computer or computer network (whether confidential or not) for any purpose other than for the performance of his job duties for the Company's benefit;

   d. Cressman breached paragraphs 5(a) and (b) of his Employment Agreement by sending Bohler client and prospective client information to Bustos when Bustos was employed at Kimley-Horn to upon information and belief aid in their prohibited solicitation of Bohler clients or prospects;

   e. Cressman breached paragraphs 5(c) and (d) of his Employment Agreement by emailing three Bohler clients about existing or prospective projects and by sending emails from his Bohler account to his and Bustos's personal email accounts about opportunities to compete with Bohler for Bohler clients and prospects;

f.  Cressman breached and/or threatens to breach paragraphs 5(e) and (f) of his Employment Agreement when, upon information and belief, he accepted a position at Kimley-Horn commencing on or about July 23, 2018 to engage in restricted activities.

g.  Cressman breached and/or threatens to breach paragraphs 5(i) and (j) of his Employment Agreement by contacting Bohler clients and prospects to encourage them to give their business to Kimley-Horn instead of to Bohler;

h.  Cressman breached paragraph 5(k) of his Employment Agreement when, while still employed at Bohler, he emailed three Bohler clients in attempts to convince those Bohler clients to move their business to Kimley-Horn;

i.  Cressman breached paragraph 5(l) of his Employment Agreement when he contacted Bohler's clients with whom he had Material Contact and forwarded information to them about Kimley-Horn while he was still employed at Bohler;

j.  Cressman breached and/or threatens to breach paragraph 5(m) of his Employment Agreement by, among other things, directly contacting Bohler's clients and forwarding those Bohler clients information about Kimley-Horn to encourage them to move their business to Kimley-Horn;

k.  Cressman breached paragraph 7 of his Employment Agreement when he failed to return, among any other company property he may have retained, the confidential and trade secret information he took from Bohler;

l.  Cressman breached paragraph 8(b) of his Employment Agreement when he sent emails, which contained Bohler confidential and trade secret information, from his

Bohler account to his and Bustos's personal accounts and to at least one other Kimley-Horn employee; and

m. Cressman breached and/or threatens to breach paragraph 8(e) of his Employment Agreement when he misappropriated a list of prospective Bohler clients, and when he contacted several current and prospective Bohler clients to persuade them to move their business to Kimley-Horn.

95.     Upon information and belief, Bustos breached and violated his Confidentiality Agreement, *inter alia*, as follows:

a. Bustos breached and/or threatens to breach paragraph 3(a) of his Confidentiality Agreement through his receipt of and, upon information and belief, misuse of Bohler confidential and trade secret information;

b. Bustos breached paragraph 3(c) of his Confidentiality Agreement when he failed to notify the appropriate Bohler personnel of his actual knowledge of his and Bustos's unauthorized use or disclosure of Bohler's information; and

c. Bustos breached paragraph 5 of his Confidentiality Agreement as he has failed to return to Bohler, in addition to any other Bohler property he may have retained, the confidential and trade secret information he received from Cressman and/or otherwise assisted in taking from Bohler.

96.     Upon information and belief, Cressman's and Bustos's misappropriation of Bohler's confidential project and customer information was done under circumstances suggesting it was done to further their plan to compete with Bohler in a manner that has breached and will continue to breach Cressman's covenant not to compete with Bohler and Bustos's Confidentiality Agreement.

21

97.     Upon information and belief, Cressman and Bustos have breached and continue to breach their respective agreements with Bohler, as detailed herein and as may be further discovered as Bohler continues to investigate Defendants' unlawful competition.

98.     Bohler has and will continue to suffer damages as a result of Cressman's and Bustos's breaches of their respective agreements with Bohler.

99.     Unless restrained, enjoined, and ordered to specifically abide by their respective agreements, Cressman and Bustos will persist in their breach of their agreements thereby causing immediate and irreparable harm to Bohler.

100.    As a result of the conduct of Cressman and Bustos, Bohler is entitled to injunctive relief enjoining them and Kimley-Horn from violating their obligations to Bohler by, among other things, using Bohler Trade Secrets and Confidential Information for the benefit of themselves and/or Kimley-Horn.

101.    As a result of the conduct of Cressman and Bustos, Bohler is entitled to recover damages and costs, including reasonable attorneys' fees as provided by their respective agreements signed by Cressman and Bustos, as well as compensatory damages in an amount to be proven at trial.

## COUNT II
## MISAPPROPRIATION OF TRADE SECRETS DTSA
### (All Defendants)

102.    Bohler incorporates by reference its allegations in the foregoing paragraphs as if fully set forth herein.

103.    The Defend Trade Secrets Act ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016, amends chapter 90 of Title 18 of the U.S. Code, forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a

22

product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1) (as amended).

104.    "Trade secrets" are broadly defined under the DTSA and includes "all forms and types of financial, business, scientific, technical, economic or engineering information."

105.    Certain confidential, proprietary, and trade secret information of Bohler constitutes trade secrets related to a service used in interstate commerce, including, but not limited to, Bohler's information related to client names, client lists, sales data, profit margins, sales strategies, suppliers, vendors, contractors, product designs and specifications, product development, cost history information, price lists, pricing formulas, projects, project concepts, and internal firm strategies constitute trade secrets and proprietary confidential information.

106.    Bohler takes reasonable measures to protect the secrecy of such information. These measures include but are not limited to password-protected databases, confidentiality and non-disclosure agreements, and, when circumstances require, non-compete agreements.

107.    Cressman and Bustos knew they each had a duty to maintain the secrecy of Bohler's trade secrets, in part, to their acknowledgment of the agreements each had signed as a condition of their employment at Bohler.

108.    Kimley-Horn is under a duty not to accept any misappropriated trade secrets including Bohler's trade secrets.

109.    Kimley-Horn is also under a duty not to disclose or use misappropriated trade secrets for the purpose of gaining a competitive advantage in the marketplace.

110.    Defendants already have and, upon information and belief, absent this Court's grant of injunctive relief, will continue to improperly acquire, disclose, and use Bohler's trade secrets without consent of any kind for their own financial gain.

111.    Cressman and Bustos have obtained, received, and/or used and, upon information and belief, absent this Court's grant of injunctive relief, Defendants will continue to disclose and utilize Bohler's trade secrets in the course of their employment with Kimley-Horn by using this information to unfairly prepare and propose competitive proposals and/or bids in competition with Bohler and otherwise to use Bohler client and project information to identify and compete with Bohler for business opportunities and for any other available competitive advantage.

112.    Defendants' actions constitute actual and continuing misappropriation in violation of the DTSA.

113.    Bohler has suffered damages and irreparable harm as a result of Defendants' breaches of the DTSA, including loss of business, harm to its goodwill and reputation, and an unfair reduction in its competitive advantage.

114.    Bohler is entitled to injunctive relief and actual damages from Defendants, jointly and severally, and for attorneys' fees.

115.    Additionally, as alleged herein, Defendants' actions were willful and/or malicious and done with the intent to harm Bohler's business, entitling Plaintiffs to recover punitive damages in an amount up to twice their actual damages, as well as costs and attorneys' fees.

116.    Bohler's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

117.    Defendants' actions will continue to cause irreparable harm and damages to Bohler and its trade secret information if not restrained.

**COUNT III**
**VIOLATION OF PENNSYLVANIA**
**UNIFORM TRADE SECRETS ACT**
**(Against all Defendants)**

118.    Bohler incorporates by reference its allegations in the foregoing paragraphs as if fully set forth herein.

119.    As set forth more fully above, Bohler's confidential and proprietary trade secrets include, without limitation, Bohler's information related to client names, client lists, sales data, profit margins, sales strategies, suppliers, vendors, contractors, product designs and specifications, product development, cost history information, price lists, pricing formulas, projects, project concepts, and internal firm strategies, and all such similar information necessary for Bohler to conduct its business in a competitive market place.

120.    Bohler's trade secrets are of value to Kimley-Horn, who is a competitor of Bohler in this and other markets.

121.    Bohler put in place appropriate safeguards to prevent disclosure of their trade secrets such as password-protected databases, confidentiality and non-disclosure agreements, and, when circumstances require, non-compete agreements.

122.    Bohler's trade secrets disclosed to Kimley-Horn by Cressman and Bustos are critical to the success of Bohler's business.

123.    Cressman and Bustos were aware of their duty to not disclose Bohler's trade secrets, and Kimley-Horn knew that the information being obtained from Cressman and Bustos was confidential and proprietary, nevertheless, Kimley-Horn chose to receive and utilize it.

124.    Defendants misappropriated Bohler's trade secrets by acquiring them through unlawful means and disclosing and using them on behalf of Bohler's competitor, and in derogation

of Bohler's interests, all in violation of the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S.A. § 5301, *et seq.*

125.    As a direct and proximate cause of Defendants' wrongful conduct, Bohler has suffered and will continue to suffer immediate and irreparable harm, incalculable financial losses, loss of the confidentiality of its trade secrets, loss of goodwill, loss of business opportunities, and other continuing harm.

126.    Bohler is entitled to actual damages from Defendants, jointly and severally, and for attorneys' fees.

127.    Additionally, as alleged herein, Defendants' actions were willful and/or malicious and done with the intent to harm Bohler's business, entitling Plaintiffs to recover punitive damages in an amount up to twice their actual damages, as well as costs and attorneys' fees.

128.    Bohler's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

129.    Defendants' actions will continue to cause irreparable harm and damages to Bohler and its trade secret information if not restrained.

### COUNT IV
### BREACH OF FIDUCIARY DUTY
#### (Against Cressman)

130.    Bohler incorporates by reference its allegations in the foregoing paragraphs as if fully set forth herein.

131.    Cressman owed a fiduciary duty to Bohler by virtue of his position of trust and confidence with Bohler and pursuant to common law.

132.    Cressman was a Business Development/Senior Project Manager and was entrusted with Bohler's confidential and trade secret information.

133.    While employed by Bohler, Cressman misappropriated confidential and trade secret information of Bohler.

134.    While still employed by Bohler, Cressman breached his fiduciary duties to Bohler by, among other misdeeds and breaches:

    a.    soliciting Bohler clients to transfer their business to Kimley-Horn;

    b.    misappropriating or causing to be misappropriated confidential business information belonging to Bohler;

    c.    acting for the purpose of diminishing Bohler's business in the area and expropriating that business for Kimley-Horn; and,

    d.    Concealing activities and misdeed from Bohler.

135.    Upon information and belief, following the end of his employment at Bohler, Cressman and Bustos have breached and, in the absence of injunctive relief, will likely continue to breach their continuing fiduciary duties to Bohler by, *inter alia* (i) using and disclosing confidential information they had acquired from Bohler, and (ii) conspiring and/or acting in concert with other employees of Kimley-Horn to do likewise, in the course of, and for the purpose of, competing unfairly against Bohler.

136.    As a result of Cressman's breach of fiduciary duties, Bohler has suffered and will suffer damages in an amount to be proven at trial.

## COUNT V
## BREACH OF DUTY OF LOYALTY
### (Against Cressman and Bustos)

137.    Bohler incorporates by reference its allegations in the foregoing paragraphs as if fully set forth herein.

138.    Cressman and Bustos owed a duty of loyalty to Bohler by virtue of their respective agreements with Bohler and pursuant to common law.

139.    While employed by Bohler, Cressman misappropriated confidential and trade secret information of Bohler and emailed that information to Bustos.

140.    While still employed by Bohler, Cressman breached his duties of loyalty to Bohler by, among other misdeeds:

    a.    soliciting Bohler customers to transfer their business to Kimley-Horn;

    b.    misappropriating or causing to be misappropriated confidential business information belonging to Bohler;

    c.    acting for the purpose of diminishing Bohler's business in the area and expropriating that business for Kimley-Horn; and,

    d.    Concealing activities and misdeed from Bohler.

141.    While still employed by Bohler, Bustos breached his duty of loyalty to Bohler by, among other misdeeds:

    a.    conspiring to solicit and/or soliciting Bohler customers to transfer their business to Kimley-Horn;

    b.    conspiring to misappropriate or causing to be misappropriated confidential business information of Bohler;

    c.    acting for the purpose of diminishing Bohler's business in the area and expropriating that business for Kimley-Horn;

    d.    receiving, accepting, failing to promptly return, and failing to notify Bohler of his receipt of misappropriated confidential business information of Bohler; and,

28

       e.     concealing activities and misdeeds from Bohler

142.    Upon information and belief, following the end of their employment at Bohler, Cressman and Bustos breached their continuing duties of loyalty to Bohler by, *inter alia* (i) continuing to access and use confidential information and trade secrets that they had acquired from Bohler during the term of their employment with Bohler PA, in the course of, and for the purpose of, competing against Bohler.

143.    As a direct and proximate cause of Cressman's and Bustos's breach of the duty of loyalty, Bohler has suffered and will continue to suffer immediate and irreparable harm, incalculable financial losses, loss of the confidentiality of its trade secrets, loss of goodwill, loss of business opportunities, and other continuing harm.

144.    As a result of Cressman's and Bustos's breach of their respective duties of loyalty, Bohler has suffered and will suffer damages in an amount to be proven at trial.

### COUNT VI
### CIVIL CONSPIRACY
### (All Defendants)

145.    Bohler incorporates by reference its allegations in the foregoing paragraphs as if fully set forth herein.

146.    Defendants formed an agreement and common scheme to misappropriate and misuse Trade Secrets and Confidential Information of Bohler.

147.    Defendants knowingly and voluntarily entered into scheme and agreement to engage in a combination of unlawful acts and misconduct including, without limitation, the following: (i) Cressman breached his contractual and fiduciary duties to Bohler, which were induced, aided and abetted by Bustos and Kimley-Horn; (ii) Bustos breached his contractual duty to Bohler, which was induced, aided and abetted by Cressman and Kimley-Horn; and (iii)

Cressman and Bustos misappropriated Bohler's confidential information and trade secrets and used and continue to use the same to unfairly compete against Bohler.

148.   The intent, purpose, and objective of the conspiracy, and the underlying combination of unlawful acts and misconduct committed by Defendants was to undermine Bohler by unfairly competing against it as described above.

149.   Defendants each understood and accepted the foregoing scheme and agreed to do their respective part, as described herein, to further accomplish the foregoing intent, purpose, and objective. Thus, by entering into the conspiracy, Defendants have each deliberately willfully, and maliciously permitted, encouraged, and/or induced all of the foregoing unlawful acts and misconduct.

150.   As a direct and proximate cause of the unlawful acts and misconduct undertaken by Defendants in furtherance of the conspiracy, Bohler has sustained and, unless Defendants are restrained and enjoined, Bohler will continue to sustain, damages in an amount to be proven at trial, as well as irreparable harm for which Bohler has no adequate remedy at law.

## COUNT VII
## AIDING AND ABETTING
### (Kimley-Horn)

151.   Bohler incorporates by reference its allegations in the foregoing paragraphs as if fully set forth herein.

152.   By virtue of his employment with Bohler, Cressman owed and continues to owe Bohler certain fiduciary duties, including, but not limited to, a duty to protect, and to not disclose or exploit for his own benefit or for the benefit of others, Bohler's confidential information and trade secrets entrusted to him as an employee of Bohler. Bustos similarly owed and continues to owe Bohler a duty not to disclose for his own benefit or the benefit of others, Bohler's confidential

information and trade secrets entrusted to him as a Bohler employee. These common law duties continue beyond termination of Cressman's and Bustos's employment at Bohler.

153.    Kimley-Horn was aware of and has reason to know of the continuing duties Cressman and Bustos owe to Bohler. For example, Caponigro, a Kimley-Horn recipient of misappropriated information at issue in this case, is a former Bohler PA employee with actual knowledge of the contractual restrictions included in Bohler's Employment and Confidentiality Agreements required of all employees in Cressman's and Bustos's positions, respectively.

154.    Upon information and belief, Kimley-Horn knowingly and intentionally committed acts that induced, encouraged, aided and abetted the contractual and common law duty breaches alleged herein, and/or participated in conduct that caused Cressman and Bustos to breach and/or continue to breach their duties to Bohler by, among other things, the following: (i) misappropriating, retaining, failing to return, disclosing, and/or using Bohler's confidential information and trade secrets in direct competition with Bohler and (ii) using such misappropriated information to unfairly compete against Bohler.

155.    The breaches of contracts and duties owed by Cressman and Bustos, and participation by Kimley-Horn in the unlawful conduct complained of herein, have proximately caused Bohler substantial damage.

156.    The foregoing tortious conduct by Kimley-Horn was knowing, intentional and of such a nature as to warrant the imposition of punitive damages

WHEREFORE, Plaintiffs respectfully pray for the following relief:

1.    A temporary restraining order and preliminary and permanent injunctions:

a. Requiring Cressman and Bustos to comply and abide in all respects with the Employment Agreement and Confidentiality Agreement, respectively, including, but not limited to:

    i. refraining from using, disclosing, or revealing any confidential information or trade secrets belonging to Bohler;

    ii. refraining from directly or indirectly soliciting the clients and/or prospective clients of Bohler (Cressman only);

    iii. pursuing or accepting any opportunity identified using Bohler confidential information and/or trade secret information;

    iv. refraining from participation in any efforts by Kimley-Horn to solicit or service any restricted customer, project, or opportunity (Cressman only);

    v. returning and/or destroying all Bohler confidential information and/or trade secret information; and,

    vi. refraining from directly or indirectly, or in any other capacity whatsoever, inducing or attempting to induce any person employed, retained, or engaged by Plaintiffs to: (a) terminate such employment or engagement, (b) accept employment or engagement with any person or entity other than Plaintiffs; (c) interfere with the business of Plaintiffs; or (d) disparage the business or reputation of Plaintiffs or any of their directors, officers, employees or other agents (Cressman only).

b.  Prohibiting Defendants from directly or indirectly, or in any other capacity whatsoever, soliciting, consummating, or accepting business from any Bohler customer or prospect about which they unlawfully accessed, copied, and/or otherwise removed confidential or trade secret information from Plaintiffs;

c.  Requiring Defendants and any other person or entity aware of the Court's Order to immediately return all documents, files, and other property Cressman and/or Bustos obtained from Bohler;

d.  Requiring Defendants Cressman and Bustos – as well as any Kimley-Horn employee who received Bohler confidential information – to immediately provide Plaintiffs with access and opportunity to make forensic copies and inspection of all personal and business computers, computer storage media, and other devices in their possession, custody, or control, including all personal and business computers, laptops, USB flash drives, PDAs, Smartphones, email accounts, and DropBox accounts, on which Defendants Cressman or Bustos sent, viewed, stored, or otherwise accessed any of Plaintiffs' data, files, or information in order for Plaintiffs to review and preserve the devices and/or confirm deletion of Plaintiffs' proprietary, confidential, and/or trade secret information;

e.  Requiring Defendants to immediately provide to Plaintiffs forensic copies of and electronic access to all personal and business emails that Defendant Cressman or Bustos sent, received, stored, or otherwise accessed, at least to the extent such emails reflected, related to, or attached any of Plaintiffs'

confidential or trade secret information, including, but not limited to, emails to and from Cressman's personal email account (cressmanjr@live.com) and Bustos's personal email account (maxbustos85@icloud.com), in order for Plaintiffs to preserve evidence and to review the extent to which Defendants misappropriated or otherwise accessed, used or disclosed Plaintiffs' proprietary, confidential, and/or trade secret information;

f.   Requiring that Defendants return to Plaintiffs any of Plaintiffs' property still in their possession, custody, or control;

g.   Requiring that for the duration of the Temporary Restraining Order, and preliminary and permanent injunctions, that Cressman shall immediately cease and desist and is further enjoined from undertaking all activities on behalf of Kimley-Horn, or any other entity involving the sale or promotion of services which directly compete with Bohler's business in (a) any state within the United States in which Cressman has engaged in Company Business while employed by Bohler; (b) any other state within the United States in which Bohler was engaged in the Company Business while Cressman was employed by Bohler; (c) any other state within the United States in which Bohler was planning to engage in business, while he was employed at Bohler and to the extent Cressman was exposed to Confidential Information concerning such plans; (d) any state within the United States in which Bohler was licensed to do business during the Three Year Period, as that term is defined in his Employment Agreement; (e) a 75-mile radius of any office of Bohler to the extent Cressman performed services in

connection with that office; and (f) any county in any state in the United States in which Bohler was actively engaged in business at the time of Cressman's termination to the extent Cressman performed services in that county or was exposed to Confidential Information concerning same and with the customers included within it.

h. Requiring that for the duration of the Temporary Restraining Order, and preliminary and permanent injunctions, that Defendants are enjoined from having any contact with any customer of Bohler for the purpose of establishing, building, enhancing, promoting or laying the ground work for a business relationship to the extent such customers project or other business information was misappropriated by Defendants and to the extent Cressman's Employment Agreement prohibits such customer solicitation, sales, or other commercial activity;

i. Requiring that for the duration of the Temporary Restraining Order, and preliminary and permanent injunctions, that Defendants are enjoined from accessing, disclosing, or using any of Plaintiffs' confidential, proprietary, or trade secret information and they shall hold it in the strictest of confidence and not divulge, disclose or reveal said information to any third party or use any such information for any purpose, including, but not limited to, any business in which Defendants have an interest or by which they are employed or may become employed; and

j. Allowing Plaintiffs to proceed with expedited discovery.

2.    An order requiring Cressman and Bustos to return to Plaintiffs an amount equal to the salary, benefits, and other compensation they were paid by Bohler during their periods of disloyalty;

3.    Compensatory damages;

4.    Punitive damages;

5.    Exemplary damages;

6.    Costs, including reasonable attorneys' fees as provided by the Employment Agreement, the Confidentiality Agreement, the Pennsylvania Uniform Trade Secrets Act, and the Defend Trade Secrets Act.

7.    Pre and post judgment interest;

8.    Such other and further relief as this Court may deem proper.

Anthony DeMichele
O'BRIEN & RYAN, LLP
2250 Hickory Rd, Suite 300
Plymouth Meeting, PA 19462
Telephone:    (610) 834-6235
Facsimile:    (610) 834-1749
Email:    ademichele@obrlaw.com

J. Kellam Warren
(Pro Hac Vice Application Pending)
MAINSAIL LAWYERS
14 South Pack Square, Ste.
502 Asheville, NC 28801
Telephone:    (919) 238-4088
Facsimile:    (888) 501-9309
Email:
kellam@mainsaillawyers.com

Jacquelyne D. Fiala
(Pro Hac Vice Application Pending)

MAINSAIL LAWYERS
7051 Highway 70S, #122
Nashville, TN 32771
Telephone:      (615) 800-2899
Facsimile:      (888) 501-9309
Email:          jfiala@mainsaillawyers.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BOHLER ENGINEERING PA, LLC** ) | |
| **and BOHLER ENGINNERING, INC.,** ) | |
| ) | |
| **Plaintiffs,** ) | **Civ. Action No.** |
| ) | |
| **v.** ) | |
| ) | |
| **GEORGE CRESSMAN,** ) | |
| **MAXIMILIANO BUSTOS, and** ) | |
| **and KIMLEY-HORN AND** ) | |
| **ASSOCIATES, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

---

## VERIFICATION OF COMPLAINT

---

STATE OF PENNSYLVANIA

COUNTY OF BUCKS

I, Robert D. Irons, P.E., hereby verify under oath and subject to penalties of perjury the following:

1. I am over eighteen (18) years of age, and I am competent to make this verification based upon my personal knowledge and belief.

2. I am a U.S. citizen and reside in Bucks County, Pennsylvania.

3. I am the Managing Partner of Bohler Engineering PA, LLC ("Bohler PA"), and I am authorized by Bohler PA and Bohler Engineering, P.C. (collectively "Bohler") to verify the Complaint in this matter, which I have read.

4. I know the factual allegations and contents thereof to be true of my own personal knowledge or based on information known personally to other employees and agents of

Bohler, and therefore within its personal knowledge, expect as to those matters stated

upon information and belief, which are true to the best of my knowledge and belief.

This Verification of Complaint is executed by me on this the 24th date of July, 2018.

Robert D. Irons, P.E.
Managing Partner

SWORN AND SUBSCRIBED before me this 26th day of July, 2018

_____ Signature of Notary Public

✓ personally known to me ___ produced identification

My Commission Expires: 5/14/2020

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Rene Schankweiler, Notary Public
New Britain Twp., Bucks County
My Commission Expires May 14, 2020
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BOHLER ENGINEERING PA, LLC )
and BOHLER ENGINEERING, P.C., )
                                             )
    Plaintiffs,                       )          Civ. Action No.
                                             )
v.                                           )
                                             )
GEORGE CRESSMAN,                             )
MAXIMILIANO BUSTOS, and                      )
and KIMLEY-HORN AND                          )
ASSOCIATES, INC.,                            )
                                             )
    Defendants.                      )

## CERTIFICATE OF SERVICE

    I, Anthony P. DeMichele, Esquire, hereby certify that I caused a copy of the foregoing

Verified Complaint, to be served, on the date indicated below, via First Class Mail, upon:

George Cressman
612 Brookwood Lane
North Wales, PA 19454

Maximiliano Bustos
228 Pine Street
Philadelphia, PA 19106

Kimley-Horn and Associates, Inc.
421 Fayetteville Street
Suite 600
Raleigh, NC 27601

1

*Anthony DeMichele*

Anthony DeMichele
O'BRIEN & RYAN, LLP
2250 Hickory Rd, Suite 300
Plymouth Meeting, PA 19462
Telephone:     (610) 834-6235
Facsimile:      (610) 834-1749
Email:          ademichele@obrlaw.com

J. Kellam Warren
(Pro Hac Vice Application Pending)
MAINSAIL LAWYERS
14 South Pack Square, Ste. 502
Asheville, NC 28801
Telephone:     (919) 238-4088
Facsimile:      (888) 501-9309
Email:          kellam@mainsaillawyers.com

Jacquelyne D. Fiala
(Pro Hac Vice Application Pending)
MAINSAIL LAWYERS
7051 Highway 70S, #122
Nashville, TN 32771
Telephone:     (615) 800-2899
Facsimile:      (888) 501-9309
Email:          jfiala@mainsaillawyers.com

*Counsel for Plaintiffs*

Dated: July 27, 2018

2

Exhibit "A"

CONFIDENTIAL

## AGREEMENT CONCERNING EMPLOYMENT, CONFIDENTIALITY, NON-SOLICITATION AND NON-COMPETITION[1]

**IN CONSIDERATION OF AND AS AN INDUCEMENT FOR** my employment and/or continued employment with Bohler Engineering, Inc. (the "Employer"), I (sometimes hereinafter referred to as "Employee") hereby represent to, and agree with, the Employer as follows:

    1. <u>At-Will Employment</u>. **I RECOGNIZE THAT I AM AN EMPLOYEE "AT WILL" OF THE EMPLOYER, AND THAT EITHER PARTY HAS THE RIGHT TO TERMINATE MY EMPLOYMENT AT ANY TIME AND FOR ANY REASON OR NO REASON**. In the event of any termination of my employment with the Employer for any reason, by either party, the Employer shall have no further obligation to make any payments to me, or to bestow any benefits on me, from and after the date of my termination, other than payments or benefits accrued and due and payable to me prior to the date of my termination. Furthermore, unless otherwise specifically agreed to in writing between the Employer and me, I shall not be entitled to receive a *pro rata* bonus or any bonus, unless I: (a) have satisfied the terms and conditions qualifying me for such bonus; (b) am employed with the Employer at the end of the calendar year; and (c) the Employer in the exercise of its discretion elects to give me such a bonus.

    2. <u>Compensation</u>. I will be compensated as determined by the Employer. Unless otherwise agreed in writing in a document signed by an authorized representative of the Employer, my compensation may be modified at any time in the Employer's sole discretion. I may also receive: (a) the employee benefits and changes in benefits (whether increases or decreases) that the Employer provides to employees in comparable positions; and (b) vacation periods with pay as established by the Employer's policy.

    3. <u>Bonus Plans</u>. I may be eligible for the Employer's bonus plan(s), if any, subject to the terms of those plans as they now exist or are amended or discontinued in the future. Payment of a bonus is at the Employer's discretion. The Employer may, in its sole discretion, add to, change or discontinue its bonus plan(s) at any time and for any reason.

    4. <u>Confidential Information; Inventions</u>.

    (a) I understand my employment with the Employer creates a relationship of confidence and trust with respect to any information of a confidential or proprietary nature that may be disclosed to me that relates to the business of the Employer, the Company, or any other Person with whom the Employer or the Company agrees to hold information of such party in confidence, and that as a result of my status with the Employer, I will gain access to Confidential Information of the Employer and/or the Company. I recognize that while employed by the Employer I may have direct access to Clients and Solicited Prospects of the Employer, Customers, and Prospective Customers, and to the extent that I hold a management position, I may have hiring and firing powers, the authority to execute certain contracts on behalf of the Employer, and access and responsibility for the profit and loss statements of my office. Furthermore, I acknowledge that the items included within the definition of Confidential Information are valuable assets of the Employer and/or Company and that the Employer and the Company have a legitimate business interest in protecting such Confidential Information.

---

[1] Hereinafter referred to as "Agreement."

Revised through 5-17-2013

CONFIDENTIAL

(b)     At all times during my employment with the Employer, and for a period of five (5) years thereafter, or for such longer period of time as may be permitted by law with respect to Confidential Information that constitutes a trade secret under applicable law, I will not, directly or indirectly, without the express authority of the Employer, unless directed by applicable legal authority having jurisdiction over me and the Employer (and provided in such instances I shall give Employer reasonable advance written notice of the Confidential Information intended to be disclosed and the reasons for such disclosure in order to permit the Employer and the Company the opportunity to contest the turnover of the Confidential Information or to seek a protective order or request for confidential treatment thereof), disclose to any Person, or use for the benefit of myself or any other Person, any Confidential Information.

(c)     Further, during my employment with the Employer, and for a period equal to three (3) years thereafter, without written approval from Ludwig H. Bohler or a Branch Manager of the Employer, I will not disclose or otherwise provide to any Person, information about the experience, qualifications, or special knowledge or personal characteristics of any individual who is or was an employee of the Company during the period of my employment with the Employer.

(d)     I will notify Ludwig H. Bohler or a Branch Manager of the Employer, verbally and in writing, immediately upon discovery of any unauthorized use or disclosure of Confidential Information, and will cooperate with the Company in every reasonable way to help the Company regain possession of such Confidential Information and prevent its further unauthorized use and/or disclosure.

(e)     I will not use, copy, alter, or delete any data or information on any Company computer or computer network (whether confidential or not) for any other purpose other than for the performance of my job duties for the benefit of the Company. Additionally, I understand and acknowledge that I am not authorized to copy, access, delete, or use the Company's Confidential Information or other business data or information for my own personal benefit or purpose, or for the benefit or purpose of any Person other than the Company.

(f)     I shall disclose promptly to the Employer any and all significant concepts and ideas for inventions, improvements and valuable discoveries, whether patentable or not, that are conceived or made by me, solely or jointly with another, during the period of employment and/or within six (6) months thereafter, and that are related to the business or activities of the Company and that I conceive as a result of my employment by the Employer, regardless of whether or not such ideas, inventions, or improvements qualify as "works for hire" or "works made for hire". I acknowledge that while employed by the Employer all of my writing, works of authorship, Inventions and other intellectual property are works made for hire and the property of the Employer, including, without limitation, patents, trademarks, service marks, copyrights and other intellectual property rights pertaining thereto.

(g)     I agree to disclose to the Employer, and to hold for the sole and exclusive benefit of the Employer, all ideas, improvements, techniques, inventions, formulae, developments, discoveries, designs, modifications, processes, trademarks, service marks, trade names, copyrightable material, trade secrets and business plans ("Inventions") developed, conceived, created, made, devised, discussed, generated, authorized, acquired or acquired knowledge of, by me while I am employed by the Employer (whether before or after the date of this Agreement), either by myself or in conjunction with any third party, which directly or indirectly relate to or may be useful in the business of the Company, whether or not the Employer obtains a patent, trademark, service mark or copyright thereon.

(h)     I hereby waive and quitclaim any and all claims of any nature whatsoever that I now or hereafter may have for infringement of any patent resulting from any patent applications for any Inventions so assigned to the Employer or its designee, and I assign and agree to assign all my interest in

- 2 -

CONFIDENTIAL

the Inventions to the Employer or its nominee. Furthermore, I agree that the Inventions shall become and remain the sole and exclusive property of the Employer and that I shall, at the Employer's request and cost, while I am employed by the Employer or at any time thereafter, take any and all actions, execute any and all applications, assignments and/or other documents and instruments and render such further services as the Employer deems necessary, convenient or desirable to secure the rights thereto by patent, copyright or otherwise to the Employer or its designee, assigns, and/or successors in interest, including, without limitation, the assignment, transfer and conveyance to the Employer or its designee of all of my rights, title and interest in and to any and all Inventions.

(i)    Prior to signing this Agreement, I shall specifically identify on the signature page of this Agreement (or on attachments hereto, if necessary) any Inventions existing as of the effective date of this Agreement that I believe should be excluded from the covenants in this Agreement related to Inventions. I understand that my obligations under this Agreement with respect to Inventions shall not apply to any Invention about which I can prove that: (a) it was developed entirely on my own time; and (b) no equipment, supplies, facility, services, or trade secret information of the Company was used in its development; and (c) it does not relate (i) directly or indirectly to the business of the Company or (ii) to the actual or demonstrably anticipated research or development of the Company; and (d) it does not result from any work performed by me for the Company.

5.    <u>Non-Solicitation and Non-Competition Covenants</u>.

(a)    During the Restricted Period, I shall not solicit, directly or indirectly, on behalf of myself or any other Person other than the Employer, any Client or Solicited Prospect of the Employer to purchase or contract for any product or service in the Restricted Area that is competitive with the Employer in the Company Business.

(b)    During the Restricted Period, I shall not solicit, directly or indirectly, on behalf of myself or any other Person other than the Company, any Customer or Prospective Customer to purchase or contract for any product or service in the Restricted Area that is competitive with the Company in the Company Business.

(c)    During the Restricted Period, I shall not request, encourage, influence, or induce, directly or indirectly, any Client or Solicited Prospect of the Employer or any other Person sharing a business relationship with the Employer to curtail, cancel, modify, or otherwise change their business relationship with the Employer, or otherwise interfere with or disrupt the Employer's relationship with such Client or Solicited Prospect of the Employer or other Person.

(d)    During the Restricted Period, I shall not request, encourage, influence, or induce, directly or indirectly, any Customer, Prospective Customer, or any other Person sharing a business relationship with the Company to curtail, cancel, modify, or otherwise change their business relationship with the Company, or otherwise interfere with or disrupt the Company's relationship with such Customer, Prospective Customer, or other Person.

(e)    During the Restricted Period, I shall not perform any work or services in the Company Business in the Restricted Area for any Client or Solicited Prospect of the Employer in any capacity in which I provide or oversee functions that could benefit from my knowledge of the Confidential Information of the Employer or Company or from any goodwill between me and any Client or Solicited Prospect of the Employer resulting from or enhanced by my employment with the Employer, including without limitation (a) as an employee of a Client or Solicited Prospect of the Employer or any other Person, (b) as a consultant for a Client or Solicited Prospect of the Employer or as a consultant for

CONFIDENTIAL

any other Person, (c) in self-employment, or (d) as partial interest holder of a Client or Solicited Prospect of the Employer or any other Person.

(f)     During the Restricted Period, I shall not perform any work or services in the Company Business in the Restricted Area for any Customer or Prospective Customer in any capacity in which I provide or oversee functions that could benefit from my knowledge of the Confidential Information of the Employer or Company or from any goodwill between me and any Customer or Prospective Customer resulting from or enhanced by my employment with the Employer, including without limitation (a) as an employee of a Customer, Prospective Customer, or any other Person, (b) as a consultant for any Customer, Prospective Customer, or other Person, (c) in self-employment, or (d) as partial interest holder of a Customer, Prospective Customer, or any other firm/company.

(g)     During the Restricted Period, I shall not entertain, socialize, or otherwise communicate with any Client or Solicited Prospect of the Employer, or Customer or Prospective Customer, for the primary or incidental purpose of establishing, building, enhancing, promoting, or laying the ground work for a business relationship between any Person other than the Company and any such Client or Solicited Prospect of the Employer, Customer, or Prospective Customer. This provision shall not restrict me from socializing with Clients or Solicited Prospects of the Employer, or Customers or Prospective Customers to the extent I have or, prior to joining Employer, had a personal, purely social relationship with the Clients or Solicited Prospects of the Employer, or the Customers or Prospective Customers, which is unrelated to my employment with Employer.

(h)     During the Restricted Period, I shall not solicit, induce, influence, or attempt to solicit, induce or influence, directly or indirectly, any other employee of the Employer or the Company to terminate or otherwise modify or alter his or her employment with the Employer or the Company, or hire for any purpose any employee of the Employer or the Company.

(i)     During the Restricted Period, I shall not negotiate, sell, pitch, plan, manage, supervise, oversee, or provide any product or service to any Client or Solicited Prospect of the Employer to the extent that such product or service is the same as (or competitive and substantially similar to) a product or service that I negotiated, sold, pitched, planned, managed, supervised, oversaw, or provided to such Client or Solicited Prospect of the Employer during my employment with the Employer.

(j)     During the Restricted Period, I shall not negotiate, sell, pitch, plan, manage, supervise, oversee, or provide any product or service to any Customer or Prospective Customer to the extent that such product or service is the same as (or competitive and substantially similar to) those I negotiated, sold, pitched, planned, managed, supervised, oversaw, or provided to such Customer or Prospective Customer during my employment with the Employer.

(k)     During the Restricted Period, I shall not solicit, call on, divert and/or accept the business of any Client or Solicited Prospect of the Employer, Customer, or Prospective Customer for the purpose of conducting Company Business in competition with the Employer or the Company or otherwise competing with or diverting business from the Employer or the Company.

(l)     During the Restricted Period, I shall not solicit, call on, encourage, induce, or influence any Person with whom I had Material Contact (a) to purchase or contract for any product or service competitive with or substantially similar to any product or service offered by, developed by, designed by, or distributed by the Employer or the Company, or (b) to terminate or otherwise change their relationship or contract with the Employer or the Company.

- 4 -

CONFIDENTIAL

(m)    During the Restricted Period, I shall not solicit or otherwise offer or agree to provide competitive services that are the same or substantially similar to those I provide or provided to the Employer or to the Company (a) to any Person with whom I had Material Contact, (b) to any Person who I (or someone for whom I was responsible) solicited, negotiated, contracted, or serviced on the Employer's or Company's behalf while I was employed by the Employer; or (c) to any Person that is a Customer or Prospective Customer with whom I had direct contact or dealings during my employment with the Employer.

6.    <u>Non-Disparagement</u>.    I agree not to make, disclose or publish, orally or in writing, statements, explanations, illustrations or comments which defame or disparage the Company or any of its personnel, its business or any of its Clients, Solicited Prospects, Customers, or Prospective Customers.  Without limitation, I agree that while I am employed by the Employer and thereafter, I will not use any website or other internet-based forum, page, site, link, or application, or any social or print media (including but not limited to Facebook and LinkedIn), to make any comment, post, or other communication or activity that disparages or otherwise casts a negative light on the Company or the Employer.

7.    <u>Return and Use of Company Property</u>.   Upon termination (for any reason, by either party) of my employment with the Employer: (i) I shall promptly deliver to the Employer all Confidential Information and all other Company property including, without limitation, all documents, memorandums, software, files, calculations, letters, papers, discs, or items of or containing any Confidential Information (including all copies, summaries, outlines or excerpts thereof) and any and all other records, designs, patents, business plans, financial statements, manuals, memoranda, lists, correspondence, reports, records, charts, advertising materials, and other data or property delivered or compiled by me by or on behalf of the Company or its representatives, vendors or customers that pertain to the business of the Company, Clients, Solicited Prospects, Customers, Prospective Customers, whether in paper, film, tape, computer disk, electronic or other form, together with all keys, credit cards, vehicles and other property of the Company; and (ii) I shall not be entitled to retain a copy, summary, outline, or excerpt of any document or information referred to in subparagraph (i) above.  I agree that all of the foregoing shall be and remain the property of the Company and be subject at all times to the Company's control.  Furthermore, except to the extent approved by the Company, or required by my bona fide job duties, I also agree that I shall not copy or remove from the Company's place of business or the place of business of a customer of the Company, property or information (in electronic form or otherwise) belonging to the Company or customer or entrusted to the Company or the customer.  In addition, I agree that I shall not provide any Confidential Information, property, documents, or other information (in electronic form or otherwise) to any competitor or other Person seeking to compete with the Company.  Likewise, after my employment with the Employer ends, for any reason, I will not use or reference the Company's name in or on any other Person's website or other print or electronic advertising, marketing, or promotional materials or tag line.

8.    <u>Best Efforts, Conflicts of Interest, and Duties of Loyalty</u>.

(a)    I acknowledge and agree that I will devote my full time, attention, energy and best efforts to my employment with Employer and the advancement of the Company's business interests, and I will not be involved in the operation or conduct of any other business or enterprise or be employed by any other employer on a full or part-time basis or serve as a consultant, independent contractor, advisor or in any other capacity with any other Person (whether before, during or after working hours with the Employer) (hereinafter referred to as "moonlighting") unless otherwise agreed to by Employer, in writing.  If my moonlighting violates the terms of this Agreement (or violates the terms of Employer's consent thereto, if any), Employer may require me to terminate the moonlighting in order to remain employed with the Employer.  Employee shall be permitted to continue his current and future

CONFIDENTIAL

involvement in the Army Reserves (herein "Military Service") and same will not constitute a violation of this Agreement. Military Service shall include any and all activities that are required for Employee's continued service in the Army Reserves including, but not limited to, weekend drills, approved time off for annual training, additional duties or schooling; and deployment, if required.

(b)    I hereby agree to and acknowledge that I have by virtue of this Agreement and/or operation of the law an undivided duty of loyalty to the Company during my employment with the Employer, and I may not engage in any conduct competitive with the Company or contrary to the Company's interests, including, but not limited to, notifying Clients, Solicited Prospects, Customers, Prospective Customers, and/or other employees of the Company of any intended departure by me from the Company, soliciting such Clients, Solicited Prospects, Customers, Prospective Customers, and/or other employees other than in furtherance of the Company's business, and/or engaging in other acts of secret competition with the Company.

(c)    I represent and warrant that I have not entered into and will not enter into any agreements with or obligations to any third party that are inconsistent or in conflict with my obligations as set forth in this Agreement. Additionally, while employed by the Employer, I agree that in my individual capacity I shall not enter into any agreement, arrangement or understanding, whether written or oral, with any supplier, contractor, distributor, wholesaler, sales representative, representative group or customer, relating to the business of the Company without the express written consent of Ludwig H. Bohler.

(d)    While employed by the Employer, I agree that I shall not, except with the prior written consent of Ludwig H. Bohler, become engaged in, render services for, or permit my name to be used in connection with, any business which competes with the Company or which activity adversely impacts my duties, other than the business of the Company or any of its Affiliates.

(e)    I shall not usurp any business opportunity of the Company that becomes known to me due to my employment with the Employer. I acknowledge and agree that any such business opportunity or knowledge belongs to the Company, and I hereby accept and agree to a fiduciary duty not to use that opportunity or knowledge for my own benefit or for the benefit of any Person other than the Company, without the express written consent of Ludwig H. Bohler.

(f)    Without limiting any other rights or remedies of Company, I acknowledge and agree to indemnify and hold harmless the Company, its shareholders, members, officers, owners, and directors from and against any and all damages, losses, liabilities, costs and other expenses (including, without limitation, reasonable attorneys' fees and expenses), which may at any time be incurred, directly or indirectly by the Company, its shareholders, members, owners, officers or directors as a result of my breach or threatened breach of this Section 8.

9.    Specialized Training. During the course of my employment with the Employer, the Company may provide me with Specialized Training. For purposes of this Agreement, "Specialized Training" means training provided to me, on the job or otherwise, during the course of my employment with the Employer, related to any Company-specific product, service, technique, strategy, process, or technology, to the extent such training information, processes, or techniques is or are not generally known to the public as compared to general industry knowledge or practice. I agree that I will not make any use whatsoever of the Company's Confidential Information or Specialized Training outside of my specifically assigned job duties with the Company and/or my Employer. Furthermore, at all times following the execution of this Agreement, I will not, directly or indirectly, disclose, communicate, or otherwise reveal to any third party for any purpose whatsoever, or use, in any manner whatsoever, for my own benefit or

- 6 -

CONFIDENTIAL

for the benefit of any other Person, any of the Company's Confidential Information or Specialized Training.

          10.    <u>Product/Service Planning, Research, and/or Development.</u>  At all times during my employment with the Employer, and for two (2) years after the termination of my employment with the Employer by either party for any reason, I agree not to, directly or indirectly, on my own behalf or on behalf of any other Person, participate in the planning, research, or development of any products or services competitive with the products or services of the Company in the Company Business, provided that I had (i) product or service planning, research, development, or oversight responsibilities regarding the same or similar product(s) during the Three Year Period, or (ii) access or exposure to the Company's Confidential Information regarding the same or similar products or services while employed by the Employer that would be beneficial to such planning, research, or development.

          11.    <u>Competitive Ownership.</u>  While I am employed by the Employer, I agree not to compete with the Employer or the Company by forming, becoming financially interested in, owning stock in, investing in, and/or controlling any competitive business or enterprise that is engaged in the Company Business, to the extent such enterprise is located in or doing business in the Restricted Area; provided, however, that Employee may passively invest in a less than two percent (2%) of the outstanding shares of a publicly-traded entity without violating this Agreement.  Excluded from the above requirement is Employee's ownership of stock with Stantec, which he earned as a Stantec employee prior to joining Employer.

          12.    <u>Customers, Vendor, and Supplier relationships.</u>  During the Restricted Period, I agree not to, on my own behalf or on behalf of any other Person, (i) encourage, induce, or influence any customer, supplier, or vendor to terminate or otherwise change its relationship or contract with the Employer or the Company, or (ii) be employed by, be engaged by, or perform services for any individual or entity that is a customer or vendor or supplier of the Employer or the Company (a) with whom I had direct dealings, contact, or communication within the Three Year Period, or (b) about whom I had knowledge of or access or exposure to Confidential Information material to the Company's contract or dealings or other contact or communication with such customer, vendor, or supplier by virtue of my employment with the Employer; provided, however, that such restriction shall only restrict me from employment in any capacity in which my performance or engagement could be enhanced by my knowledge and understanding of the Employer's or Company's Confidential Information, including but not limited to details of the Employer's or Company's customer, vendor, or supplier terms or relationship that are not readily available to the public.

          13.    <u>Defined Terms:</u>  For purposes of this Agreement, the following capitalized terms shall be defined as follows:

          (a)    "Affiliates" means all separate or related entities of which Bohler Engineering, P.C. or Ludwig H. Bohler own a majority in interest (i.e., more than 50% of the stock, shares, or other interests) at any time through the termination of my employment with the Employer, including, without limitation, Bohler Engineering, Inc., Bohler Engineering NJ, LLC, Bohler Engineering MA, LLC, Bohler Engineering NY, PLLC, Bohler Engineering VA, LLC, Bohler Engineering, LLC, Bohler Engineering NC, PLLC, Control Point Associates, Inc., Atlantic Traffic & Design Engineers, Inc. and Whitestone Associates, Inc. Each such Affiliate shall be a beneficiary of this Agreement, with the right to enforce its terms.

          (b)    "Company" for purposes of this Agreement shall mean the Employer and Bohler Engineering, P.C. and its Affiliates, as well as any successor in interest, including without limitation, any assignee or purchaser of all or any portion of Company.

CONFIDENTIAL

(c) "Company Business" shall mean any competitive lines of business, services or related activities of a type or character engaged in, or substantially similar to those engaged in, by the Company during the last five (5) years of my employment with Company (or as may be contemplated to be engaged in by the Company at the time of termination of my employment with the Company), to the extent that I was involved in, was exposed to, or otherwise had knowledge of Confidential Information related to such lines of business, services, or related activities as a result of my employment with the Company. Without limitation, to the extent that I was involved in, was exposed to, or otherwise had knowledge of Confidential Information related to such lines of business, services, or related activities as a result of my employment with the Employer, such "Company Business" shall include any line(s) of business competitive with the Company involving or related to: (a) land development services from site evaluation and due diligence through project completion, including without limitation civil and consulting engineering, land surveying, project management, environmental consulting, landscape architecture, LEED and LID civil design consulting, permitting services, and planning, and (b) any and all other lines of business conducted by the Company in which Employee was involved in or exposed to during Employee's employment with the Employer.

(d) "Confidential Information" shall include, but not be limited to, all techniques, technology, programs, processes, products, activities, personnel, books, records, data, documents, materials, drawings, reports, designs, specifications, and software not generally known to the public or industry nor otherwise in the public domain, that relates to the business, operations, properties, Client, Solicited Prospect, Customer, Prospective Customer, finances, plans, special needs of Clients or Solicited Prospects, proposals, or practices of the Company or of any third parties (including Clients and Solicited Prospects) doing business with the Company and includes, without limitation, the identities of all Clients, Solicited Prospects and suppliers, Client preferences, purchasing histories, business opportunities and/or proposals, personnel and personnel information, client sales and billing information, Client lists and contact information, business plans and proposals, marketing data, plans, strategies, an d proposals, technical plans and proposals, contracts, bids or project proposals, sales, budgets and projections, pricing information and strategies, purchasing or cost data, non-public financial information, trade secrets and all other valuable or proprietary business information.

(e) "Client" is defined for purposes of this Agreement as any Person doing business with or which has done business with the Employer or the Company in the Three Year Period, but only to the extent that (i) I (or someone for whom I was responsible) had dealings or other business related contact or communication with such Client(s) on behalf of the Employer and/or Company, or (ii) to the extent that I was exposed to, had access to, or actually accessed Confidential Information pertaining to such Client(s) in connection with my employment with the Employer. The Parties agree and acknowledge that this definition of Client is not intended to enlarge the time period of any restrictive covenant but is merely intended to define the identity of Clients restricted during the restricted time period(s) stated herein. The definition of "Client" hereunder and this Agreement's restrictions regarding a "Client" or "Clients" specifically exclude those entities identified in **Exhibit "A"** to this Agreement (collectively herein "Excluded Clients"), but only so long as Employee has both solicited and secured civil engineering work from those Excluded Clients within eighteen (18) months of the Effective Date of this Agreement. Any Excluded Clients whom Employee fails to solicit and secure civil engineering work from within eighteen (18) months of the Effective Date of this Agreement are included within this Agreement's "Client" definition, with all of the attendant restrictions outlined herein applicable to those Clients. If Employee is separated from his employment with Company for any reason prior to eighteen (18) months of the Effective Date of this Agreement and Employee has, as of the date of separation, failed to solicit and secure any of the Excluded Clients, those Excluded Clients shall be included within this Agreement's "Client" definition, with all of the attendant restrictions outlined herein applicable to those Clients.

CONFIDENTIAL

(f)    "Customer" is defined for purposes of this Agreement as any Person doing business with or which has done business with the Employer or the Company in the Three Year Period, but only to the extent that such Person contracted for or purchased any product or service in the Company Business from the Employer or the Company in the Three Year Period. The Parties agree and acknowledge that this definition of Customer is not intended to enlarge the time period of any restrictive covenant but is merely intended to define the identity of Customers restricted during the restricted time period(s) stated herein. The definition of "Customer" hereunder and this Agreement's restrictions regarding a "Customer" or "Customers" specifically exclude those entities identified in **Exhibit "A"** to this Agreement (collectively herein "Excluded Customers"), but only so long as Employee has both solicited and secured civil engineering work from those Excluded Customers within eighteen (18) months of the Effective Date of this Agreement. Any Excluded Customers whom Employee fails to solicit and secure civil engineering work from within eighteen (18) months of the Effective Date of this Agreement are included within this Agreement's "Customer" definition, with all of the attendant restrictions outlined herein applicable to those Customers. If Employee is separated from his employment with Company for any reason prior to eighteen (18) months of the Effective Date of this Agreement and Employee has, as of the date of separation, failed to solicit and secure any of the Excluded Customers, those Excluded Customers shall be included within this Agreement's "Customer" definition, with all of the attendant restrictions outlined herein applicable to those Customers.

(g)    "Ludwig H. Bohler" shall mean Ludwig H. Bohler or his designee, assign(s), or successor(s) in interest.

(h)    "Material Contact" exists between me and each client or potential client: (i) with whom I dealt; (ii) whose dealings with the Company were coordinated or supervised by me or someone who reported directly to me; (iii) about whom I obtained Confidential Information in the ordinary course of business as a result of my association with the Company; or (iv) who has received (or will receive) products or services from the Company, the sale or provision of which has resulted (or will result) in compensation, commissions, or earnings for me within three years prior to the cessation of my employment with the Company for any reason.

(i)    "Person" shall mean any natural person, firm, corporation, partnership, limited liability company, association, company or other individual or entity.

(j)    "Prospective Customer" is defined for purposes of this Agreement as any Person given a bid, quote, proposed contract, estimate, pitch, or presentation by the Employer or the Company during the Three Year Period. The Parties agree and acknowledge that this definition of Prospective Customer is not intended to enlarge the time period of any restrictive covenant but is merely intended to define the identity of Prospective Customers restricted during the restricted time period(s) stated herein. The definition of "Prospective Customer" hereunder and this Agreement's restrictions regarding a "Prospective Customer" or "Prospective Customers" specifically exclude those entities identified in **Exhibit "A"** to this Agreement (collectively herein "Excluded Prospective Customers"), but only so long as Employee has both solicited and secured civil engineering work from those Excluded Prospective Customers within eighteen (18) months of the Effective Date of this Agreement. Any Excluded Prospective Customers whom Employee fails to solicit and secure civil engineering work from within eighteen (18) months of the Effective Date of this Agreement are included within this Agreement's "Customer" definition, with all of the attendant restrictions outlined herein applicable to those Customers. If Employee is separated from his employment with Company for any reason prior to eighteen (18) months of the Effective Date of this Agreement and Employee has, as of the date of separation, failed to solicit and secure any of the Excluded Prospective Customers, those Excluded Prospective Customers shall be included within this Agreement's "Customer" definition, with all of the attendant restrictions outlined herein applicable to those Customers.

CONFIDENTIAL

(k)    "Restricted Period" shall include (i) all times during my employment with the Company, and (ii) the twenty-four (24) month period following the cessation of my employment with the Company for any reason.

(l)    "Restricted Area" means  (a) any state within the United States in which I have engaged in the Company Business while employed by the Employer; (b) any other state within the United States in which the Employer or the Company is engaged in the Company Business; (c) any other state within the United States in which the Employer or the Company is planning to engage in the Company Business while I am employed by the Employer, but only to the extent that I accessed or was exposed to Confidential Information concerning such plans; (d) any state within the United States in which the Company is licensed to do business during the Three Year Period; (e) a 75-mile radius of any office of the Company but only to the extent Employee performed services in connection with such office or to the extent Employee accessed or was exposed to the Confidential Information of such office; and (f) any county in any state in the United States in which the Company is actively engaged in business at the time of Employee's termination, but only to the extent that Employee performed services in connection with the Company in such county or to the extent Employee accessed or was exposed to the Confidential Information of the Company's customers, prospects, or services in such county.

(m)    "Solicited Prospect" is defined for purposes of this Agreement as any potential client to which the Company has submitted proposals, bids or has had communication with (oral or written) during the Three Year Period to discuss the Company's representation of, or the performance of professional services for, the prospect, or which has provided confidential information to the Company but only to the extent that (i) I (or someone for whom I was responsible) had dealings or other business related contact or communication with such Solicited Prospect(s) on behalf of the Company, or (ii) to the extent that I was exposed to or accessed Confidential Information pertaining to such Solicited Prospect(s) in connection with my employment with the Employer.  The Parties agree and acknowledge that this definition of Solicited Prospect is not intended to enlarge the time period of any restrictive covenant but is merely intended to define the identity of Solicited Prospects restricted during the restricted time period(s) stated herein.   The definition of "Solicited Prospect" hereunder and this Agreement's restrictions regarding a "Solicited Prospect" or "Solicited Prospects" specifically exclude those entities identified in **Exhibit "A"** to this Agreement (collectively herein "Excluded Prospects"), but only so long as Employee has both solicited and secured civil engineering work from those Excluded Prospects within eighteen (18) months of the Effective Date of this Agreement.  Any Excluded Prospects whom Employee fails to solicit and secure civil engineering work from within eighteen (18) months of the Effective Date of this Agreement are included within this Agreement's "Customer" definition, with all of the attendant restrictions outlined herein applicable to those Customers.  If Employee is separated from his employment with Company for any reason prior to eighteen (18) months of the Effective Date of this Agreement and Employee has, as of the date of separation, failed to solicit and secure any of the Excluded Prospects, those Excluded Prospects shall be included within this Agreement's "Customer" definition, with all of the attendant restrictions outlined herein applicable to those Customers.

(n)    "Three Year Period" is defined for purposes of this Agreement to mean (a) the three (3) year period preceding the activity to be restricted under this Agreement (while I am remain employed by the Employer), and (b) the last three (3) years of my employment with the Employer (once my employment with the Employer terminates for any reason).

14.    Remedies.

(a)    <u>Injunctions; other damages/relief.</u>  I acknowledge that monetary damages alone will not adequately compensate the Employer or the Company in the event I breach the restrictions, limitations or restraints contained in this Agreement. I agree and acknowledge that the Employer and the

- 10 -

CONFIDENTIAL

Company do not have any adequate remedy at law for the breach or threatened breach by me of any of the restrictions, limitations or restraints of this Agreement and agree that if I breach, or threaten to commit a breach of, any of the restrictions, limitations or restraints of or in this Agreement, the Employer and/or the Company and its Affiliates shall have the rights and remedies set forth below and elsewhere in this Agreement, each of which right and remedy shall be independent of the other and severally enforceable, and all of which rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to the Employer and/or the Company and its Affiliates under law or in equity (including, without limitation, the recovery of damages).

      (b)    <u>Specific performance.</u>  Company and/or Employer shall have the right and remedy to have the provisions of this Agreement specifically enforced (without posting bond or other security and without the need to prove damages) by any court having equity or other appropriate jurisdiction, including, without limitation, the right to an entry against me of restraining orders and injunctions (preliminary, mandatory, temporary and permanent) against violations, threatened or actual, and whether or not then continuing, of such provisions.

      (c)    <u>Reasonableness of restrictions.</u>  I agree that the restrictions, limitations and restraints contained in this Agreement are reasonable and necessary to protect the Company's assets and Company's legitimate business interests. It is further agreed that it is the intention of the parties to this Agreement that the restrictions, limitations and restraints contained in this Agreement are reasonable and shall be construed and enforced in accordance with the changing activities, business and locations of the Company throughout the term of said restrictions, limitations and restraints. If I violate any of the Restricted Period-based restrictions in this Agreement, I agree that the Restricted Period provided for in each such subparagraph shall be increased by the period of time from the commencement of any such violation until the time such violation shall be cured by me; or, in the event the Employer or other party with standing to enforce this Agreement seeks judicial enforcement of this Agreement, I hereby consent to extend the Restricted Period in any injunction by the period of time that I breached the applicable Restricted Period-based restriction(s), as permitted by applicable law. Fu rthermore, I agree that no subsequent change or changes in the employment parameters, including duties, salary or other terms of my employment arrangements with the Employer shall in any way affect the validity of this Agreement. The termination of my employment with the Employer, for any reason, by either party, shall not release me from the obligations imposed upon me under this Agreement, and this Agreement shall survive the termination of my employment with the Employer, regardless of who initiated the termination or the reason or manner of such termination. The real or perceived existence of any claim or cause of action by me against the Employer or the Company, whether predicated on this Agreement or some other basis, shall not relieve me of my obligations under this Agreement and shall not constitute a defense to the enforcement by the Employer or the Company of the restrictions and covenants contained herein.

      (d)    <u>Attorneys' fees.</u>  In the event that the Company and/or the Employer prevails in a legal action brought by any party to enforce or interpret any of the provisions of this Agreement, the Company shall, in addition to any other recovery, be entitled to its reasonable attorneys' fees and expenses arising from such action and any appeal or any bankruptcy action related thereto. For purposes of this Agreement, "prevails" shall mean, in the case of the Company and/or the Employer asserting a claim, the Company is successful in obtaining substantially all of the relief sought, and in the case of the Company and/or the Employer defending against or responding to a claim, the Company and/or the Employer is successful in denying substantially all of the relief sought.

      15.    <u>Representations and Warranties.</u>  I represent that I am not subject to any agreement or restriction limiting in any way the scope of this Agreement, or in any way inconsistent with any of the promises made by me in this Agreement. I also understand that the Company will not require, and the Company does not expect, me to disclose to the Company or use at or for the Company any secret

CONFIDENTIAL

or confidential information or trade secret that I obtained from any of my former employers, which is not publicly available. I agree not to use at or for the Company any such trade secrets or confidential information, or property belonging to any of my former employers or any other third parties, without proper authorization from them. I agree to indemnify and hold the Company harmless from any and all claims, judgments, or liabilities that this Agreement and/or employment of me by the Company violate the rights of any third party or parties, and from any costs and expenses, including reasonable attorneys' fees, incurred by the Company in the defense thereof.

16.    Assignment. This Agreement is personal in nature, and neither this Agreement nor any rights hereunder may be assigned by me without the prior written consent of the Employer. Any purported assignment without said consent shall be void. The Employer may freely assign this Agreement in connection with any sale of all or substantially all the assets of the Employer or the transfer of control of the Employer by its shareholders.

17.    Disclosure of this Agreement. I acknowledge and understand that this Agreement may affect and limit my ability to perform certain services and activities for Clients and Solicited Prospects of the Employer and for Customers and Prospective Customers, as set forth above, at any new employer or in other subsequent business association. I agree that at the cessation of employment with the Employer for any reason, I shall inform the Employer in writing of the name and address of my new employer or other business association prior to commencement of that new employment or business relationship. I further agree to give notice of this Agreement, including the restrictions contained herein, to any prospective employer or business associate, at my discretion. The parties agree that the Company may need to, and is authorized by me, to forward a copy of this Agreement to a future employer, prospective employer, partner, or other business associate of mine if the Employer in its sole discretion determines that there is or may be a risk or threat of a potential or actual breach of this Agreement by me, or in the event of a related claim, litigation, or court order.

18.    Miscellaneous Terms and Provisions.

(a)    Agreement to Be Construed Fairly. This Agreement is to be construed fairly and not in favor of or against either party, regardless of which party drafted or participated in the drafting of its terms. Any rule of construction that a document is to be construed against the drafting party shall not be applicable to this Agreement.

(b)    Binding Nature; Successors. This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, executors, administrators, personal representatives, successors, and permitted assigns. The term "personal representative" as used in this Agreement with respect to an individual shall mean such individual's guardian, committee, executor, administrator or other legal representative duly empowered to act on his behalf following his death or legal incapacity. The capitalized terms "Employer" and "Company" as used in this Agreement shall include any legal successor of such entity or entities by merger, consolidation, conversion to corporate form, transfer of assets to a subsidiary, or similar legal transaction or reorganization.

(c)    Severability. If any provision of this Agreement shall be deemed invalid or unenforceable as written, it shall be construed, to the extent possible, in a manner which shall render it valid and enforceable, and any limitations on the scope or duration of any such provision necessary to make it valid and enforceable shall be deemed to be part thereof; no invalidity or unenforceability shall affect any other portion of this Agreement. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall be blue penciled or judicially reformed to the extent permissible under applicable law in order to render such provision reasonable and enforceable with as little reduction of such restriction(s) as is necessary in order to make such restriction(s) enforceable. To the extent any

- 12 -

CONFIDENTIAL

provision of this Agreement prohibited or unenforceable in any jurisdiction cannot be rendered enforceable in any jurisdiction through judicial reformation or blue penciling, such provision shall, as to such jurisdiction, be severed and be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

      (d)    Amendment; Waiver.    This Agreement constitutes the entire understanding between the parties with reference to the subject matter hereof and, upon execution by the parties, shall supersede and replace any other agreement regarding the subject matter herein. No change or modification of this Agreement shall be valid unless the same is in writing and is signed by all parties hereto. No waiver of any provision of this Agreement shall be valid unless the same is in writing and is signed by the party to be charged. The failure of any party at any time to insist upon strict performance of any covenant, representation or warranty herein set forth shall not be construed as a waiver of the same or any other covenant, representation or warranty at the same or a future time.

      (e)    Headings; References.    The headings in this Agreement are for convenience of reference only and are not intended to define or limit the contents of any section or paragraph. Unless otherwise expressly stated herein, references to Sections shall refer to sections of this Agreement.

      (f)    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which together constitutes one and the same instrument. A scanned copy, facsimile transmission, or photocopy of this document is legal and binding, by agreement of the parties.

      (g)    Jurisdiction and Venue. All disputes arising from or relating to this Agreement shall be subject to the exclusive jurisdiction of and be litigated in the state or federal courts of New Jersey. The Parties hereby waive any claims of improper venue or lack of personal jurisdiction as to any such dispute.

      (h)    Governing Law. This Agreement and any amendments hereof shall be governed by and construed in accordance with the laws (both substantive and procedural) of the State of New Jersey applicable to contracts made and to be performed therein.

      19.    WAIVER OF JURY TRIAL. TO THE FULLEST EXTENT PERMITTED BY LAW, THE COMPANY AND THE EMPLOYEE, BY EXECUTION OF THIS AGREEMENT, WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT.

      20.    Advice of Counsel.    I expressly state that I have been afforded the opportunity and sufficient time to review this Agreement with counsel, legal and otherwise, of my choice prior to execution of this Agreement by me.

*[Signature on following page; Balance of page intentionally left blank]*

CONFIDENTIAL

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year indicated below, with this Agreement effective upon the date the last party executes this Agreement.

George Cressman
612 Brookwood Lane
North Wales, PA 19454

By: _____

Name: George Cressman

Date: 12 FEB 14

BOHLER ENGINEERING, INC.

Address:

By: _____

Name: Ludwig H. Bohler, P.E.

Title: President

Date: 2/13/14

ACKNOWLEDGMENT

State of Pennsylvania

County of Philadelphia      ss:

On 2/12 , 2014 before me, personally appeared GEORGE CRESSMAN personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the foregoing instrument and he/she, being by me duly sworn, acknowledged, deposed and said that such instrument was made, signed, sealed and delivered by him as his voluntary act and deed.

WITNESS my hand and official seal. — AS TO George Cressman only

Signature _____

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
ELAINE SACHS, Notary Public
City of Philadelphia, Phila. County
My Commission Expires June 1, 2018

- 14 -

Exhibit "B"

CONFIDENTIAL

**BOHLER ENGINEERING PA, LLC**
**CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT**

THIS CONFIDENTIALITY and NON-DISCLOSURE AGREEMENT ("Agreement") is made by and between Bohler Engineering PA, LLC (hereinafter called the "Company"), its direct or indirect subsidiaries, affiliates, related entities, and divisions (collectively "Bohler" and that term is more fully and completely defined below) and Maximiliano Bustos.

WHEREAS, Employee desires to become or remain employed by the Company and in consideration of such employment/continued employment of Employee by the Company, and other good and valuable consideration to Employee, the receipt and sufficiency of which is hereby acknowledged and agreed to by the parties to this Agreement including, but not limited to, with respect to the Employee, specialized training and access to Confidential Information (as defined below), the parties agree as follows:

1.  **EMPLOYMENT AT-WILL. THE COMPANY HEREBY EMPLOYS (OR CONTINUES TO EMPLOY) EMPLOYEE AS AN EMPLOYEE OF THE COMPANY. EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE'S EMPLOYMENT RELATIONSHIP WITH THE COMPANY IS AT-WILL AND THAT EITHER PARTY MAY TERMINATE THE RELATIONSHIP, FOR ANY REASON OR FOR NO REASON, WITH OR WITHOUT CAUSE, AND WITHOUT NOTICE OF ANY KIND.** In the event of any termination of my employment with the Company for any reason, by either party, the Company shall have no further obligation to make any payments to me, or to bestow any benefits on me, from and after the date of my termination, other than payments or benefits accrued and due and payable to me prior to the date of my termination. I will be compensated as determined by the Company. Unless otherwise agreed in writing in a document signed by an authorized representative of the Company, my compensation may be modified at any time in the Company's sole discretion.

2.  **INTENTION.** Employee acknowledges that Employee and the Company have entered a confidential relationship of trust. Employee will serve the Company faithfully, devote Employee's best efforts to carry out Employee's responsibilities on behalf of the Company, and will not engage in any employment activity for others competitive with the Company or Bohler, without the prior written consent of the Company, which shall be in Company's sole discretion. Employee acknowledges all lists and records remain the property of the Company. Employee will abide by the policies of the Company and Bohler and Employee understands that the Company and/or Bohler may change such policies from time to time. I understand my employment with the Company creates a relationship of confidence and trust with respect to any information of a confidential or proprietary nature that may be disclosed to me that relates to the business of the Company, Bohler, or any other person or entity with whom the Company and/or Bohler agrees to hold information of such party in confidence, and that as a result of my status with the Company, I will gain access to Confidential Information of the Company and/or Bohler, defined below.

3.  **CONFIDENTIAL INFORMATION.** The term "Confidential Information" means any proprietary or business-sensitive information, which is not generally known to the public and which, if released to unauthorized persons, would be detrimental to the reputation or business interests of the Company and/or Bohler, or other parties with which it or they does or do business, or would permit such unauthorized persons to improperly benefit. Employee and the Company agree that Confidential Information includes, but is not limited to: (i) financial information; (ii) customer/client information, including but not limited to customer/client names, telephone numbers, contact information, addresses, any compilations of past, existing or prospective clients, client proposals or agreements, status of client accounts or credit, client needs, client preferences, purchasing histories, marketing data, technical plans, contracts, bids or project proposals, sales, budgets and projections, business opportunities and/or proposals, client sales and billing information, and/or related information about actual or prospective clients; (iii) supply and service information; (iv) marketing information; (v) personnel and personnel information, including, without limitation, salaries, bonuses, benefits, job descriptions, and relative skills and abilities; (vi) business operations information; (vii) any formula, technique, trade secrets, technology, program, processes, products, activities, books, records, data, documents, materials, drawings, reports, designs, specifications and software not generally known to the public or industry nor otherwise in the public domain, that relates to the business, operations, properties, practices, purchasing or cost data, pricing information, pattern, device or compilation of information, and all other valuable or proprietary information, which is used in the Company's business and which gives the Company an advantage over its competitors; and (viii) specialized training. The Company will provide Employee with access to

1

Confidential Information, which the Company deems necessary for Employee to perform Employee's job functions, during the term of Employee's employment.

    (a)    Employee recognizes that such Confidential Information is the property of the Company and/or Bohler, and Employee shall not disclose to others (except as required in performing Employee's duties to the Company or required under the law), nor will Employee use for Employee's or another's benefit, any such Confidential Information, during Employee's employment with the Company and for a period of five (5) years thereafter, or for such longer period of time as may be permitted by law with respect to Confidential Information, I will not, directly or indirectly, without the express authority of the Company or Bohler, unless directed by applicable legal authority having jurisdiction over me and the Company (and provided in such instances I shall give the Company and Bohler reasonable advance written notice of the Confidential Information intended to be disclosed and the reasons for such disclosure in order to permit the Company and Bohler the opportunity to contest the turnover of the Confidential Information or to seek a protective order or request for confidential treatment thereof), disclose to any person or entity, or use for the benefit of myself or any other person or entity, any Confidential Information.

    (b)    Further, during my employment with the Company, and for a period equal to three (3) years thereafter, without written approval from Adam J. Volanth or a Branch Manager of the Company, if applicable, I will not disclose or otherwise provide to any person or entity, information about the experience, qualifications, or special knowledge or personal characteristics of any individual who is or was an employee of the Company or Bohler during the period of my employment with the Company.

    (c)    I will notify Adam J. Volanth or a Branch Manager of the Company, if applicable, verbally and in writing, immediately upon discovery of any unauthorized use or disclosure of Confidential Information, and will cooperate with the Company and Bohler in every reasonable way to help the Company and/or Bohler regain possession of such Confidential Information and prevent its further unauthorized use and/or disclosure.

    (d)    I will not use, copy, alter, or delete any data or information on any Company or Bohler computer or computer network (whether confidential or not) for any other purpose other than for the performance of my job duties for the benefit of the Company and Bohler. Additionally, I understand and acknowledge that I am not authorized to copy, access, delete, or use the Company's Confidential Information or other business data or information for my own personal benefit or purpose, or for the benefit or purpose of any person or entity other than the Company.

4.    **NON-DISPARAGEMENT.** I agree not to make, disclose or publish, orally or in writing, statements, explanations, illustrations or comments which defame or disparage the Company and/or Bohler and any of its or their personnel, its or their business or any of its or their clients. Without limitation, I agree that while I am employed by the Company and thereafter, I will not use any website or other internet-based forum, page, site, link, or application, or any social or print media (including but not limited to Facebook and LinkedIn), to make any comment, post, or other communication or activity that disparages or otherwise casts a negative light on the Company or Bohler.

5.    **RETURN AND USE OF COMMON PROPERTY.** Upon termination (for any reason, by either party) of my employment with the Company: (i) I shall promptly deliver to the Company all Confidential Information and all other Company and Bohler property including, without limitation, all documents, memorandums, software, files, calculations, letters, papers, discs, or items of or containing any Confidential Information (including all copies, summaries, outlines or excerpts thereof) and any and all other records, designs, patents, business plans, financial statements, manuals, memoranda, lists, correspondence, reports, records, charts, advertising materials, and other data or property delivered or compiled by me by or on behalf of the Company or its representatives, vendors or customers that pertain to the business of the Company or its clients whether in paper, film, tape, computer disk, electronic or other form, together with all keys, credit cards, vehicles and other property of the Company; and (ii) I shall not be entitled to retain a copy, summary, outline, or excerpt of any document or information referred to in subparagraph (i) above. I agree that all of the foregoing shall be and remain the property of the Company and be subject at all times to the Company's control. Furthermore, except to the extent approved by the Company, or required by my bona fide job duties, I also agree that I shall not copy or remove from the Company's place of business or the place of business of a client of the Company, property or information (in electronic form or otherwise) belonging to the Company or client or entrusted to the Company or the client. In addition, I agree that I shall not provide any Confidential Information, property, documents, or other information (in electronic form or otherwise) to any competitor or other

person or entity seeking to compete with the Company or Bohler. Likewise, after my employment with the Company ends, for any reason, I will not use or reference the Company's name in or on any other person's or entity's website or other print or electronic advertising, marketing, or promotional materials or tag line.

6.    **REASONABLENESS OF RESTRAINTS, IRREPARABLE HARM.**  Employee acknowledges that: a) the agreements and covenants contained herein are reasonably necessary to protect the goodwill, Confidential Information,  and other business interests of the Company; b) any breach or threatened breach of the covenants contained herein will cause the Company and/or Bohler immediate irreparable harm for which injunctive relief would be necessary and regarding which monetary damages alone will not adequately compensate the Company and/or Bohler; c) the covenants contained herein are essential and material elements of this Agreement and the Company would not have entered into this Agreement or permitted Employee to obtain employment or remain employed without those covenants being included in this Agreement; d) Employee has had the opportunity to consult with and be advised by legal counsel concerning the reasonableness and propriety of the covenants contained herein; and e) in the event of any violation, or threatened or attempted violation of the covenants contained herein, the Company shall be entitled to a temporary restraining order, temporary or permanent injunctions, specific performance, and other injunctive relief, without any showing of irreparable harm or damage or any need to post a bond, in addition to any other rights or remedies which may then be available to the Company.  The rights set forth in this Agreement are in addition to, rather than in lieu of, any other rights and remedies available to the Company and/or Bohler. All of the Company's and/or Bohler's rights set forth herein or existing under the law shall be independent of one and other and severally enforceable. In addition to, but not instead of, any other legal or equitable remedies available to the Company, Employee hereby agrees to reimburse the Company for reasonable attorneys' fees and costs incurred by the Company in the event of any violation or attempted violation of this Agreement.

7.    **WAIVER OF BREACH.** The Company's waiver of Employee's breach of any provision of this Agreement by Employee does not waive any subsequent breach by Employee, nor does the Company's failure to take action against any other Employee for a similar breach or breaches operate as a waiver by the Company of a breach.

8.    **REASONABLENESS OF RESTRICTIONS and ATTORNEY'S FEES.**  I agree that the restrictions, limitations and restraints contained in this Agreement are reasonable and necessary to protect the Company and Bohler's assets and Company and Bohler's legitimate business interests.  It is further agreed that it is the intention of the parties to this Agreement that the restrictions, limitations and restraints contained in this Agreement are reasonable and shall be construed and enforced in accordance with the changing activities, business and locations of the Company throughout the term of said restrictions, limitations and restraints.  In the event that the Company and/or Bohler prevails in a legal action brought by any party to enforce or interpret any of the provisions of this Agreement, the Company and/or Bohler shall, in addition to any other recovery, be entitled to its reasonable attorneys' fees and expenses arising from such action and any appeal related thereto.  For purposes of this Agreement, "prevails" shall mean, in the case of the Company and/or Bohler asserting a claim, the Company and/or Bohler is successful in obtaining substantially all of the relief sought, and in the case of the Company and/or Bohler defending against or responding to a claim, the Company and/or Bohler is successful in denying substantially all of the relief sought.

9.    **FORUM AND LAW SELECTION.**  This Agreement shall be construed in accordance with and governed for all purposes by the law of the State of New Jersey, without regard to its conflict of law provisions.  The parties consent and agree that any action or proceeding between them arising from this Agreement shall be brought exclusively in the state or federal courts of the State of New Jersey and Employee hereby expressly consents to the personal jurisdiction thereof.

10.    **MISCELLANEOUS.**  This Agreement supersedes any and all prior understandings and agreements between the parties concerning Employee's duty to maintain the secrecy of the Company's Confidential Information.  To the extent any portion of this Agreement, or any portion of any provision of this Agreement is held to be invalid or unenforceable, it is the parties' express intent it shall be construed by severing, limiting and reducing it so as to be enforceable to the extent compatible with applicable law.  All remaining provisions, and/or portions thereof, shall remain in full force and effect.  This Agreement may not be altered or amended except in writing, signed by Employee and an authorized representative of the Company, wherein specific reference is made to this Agreement, provided, however, no such signed writing will be required for a modification of the covenants by a court to make

3

them enforceable to the extent compatible with applicable law. The headings of each paragraph of this Agreement are for convenience only, and shall not affect the meaning or intent of any provision of this Agreement. The rights and remedies in this Agreement shall be deemed cumulative, and the exercise of one such remedy shall not operate to bar the exercise of any other rights and remedies reserved to the Company or available at law or in equity. This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, related or associated entities, and Employee. The Employer may freely transfer or assign this Agreement. The capitalized terms "Employer" and "Company" as used in this Agreement shall include any permitted assigns, as well as any legal successor of such entity or entities by merger, consolidation, conversion to corporate form, transfer of assets to a subsidiary, or similar legal transaction or reorganization.

11.    Defined Terms:  For purposes of this Agreement, the following capitalized terms shall be defined as follows:

   (a)    "Affiliates" means all separate or related entities of which Bohler Engineering, P.C. or Adam J. Volanth own a majority in interest (i.e., more than 50% of the stock, shares, or other interests) at any time through the termination of my employment with the Employer, including, without limitation, Bohler Engineering, Inc., Bohler Engineering NJ, LLC, Bohler Engineering MA, LLC, Bohler Engineering NY, PLLC, Bohler Engineering VA, LLC, Bohler DC, LLC, Bohler Engineering NC, PLLC, Bohler Engineering FL, LLC, Bohler Engineering PA, LLC, Bohler Engineering GA, LLC, Bohler Engineering TX, LLC and Atlantic Traffic & Design Engineers, Inc. Each such Affiliate shall be a beneficiary of this Agreement, with the right to enforce its terms.

   (b)    "Bohler" for purposes of this Agreement shall mean the Employer and Bohler Engineering, P.C. and its Affiliates, as well as any successor in interest, including without limitation, any assignee or purchaser of all or any portion of Bohler.

   (c)    "Company Business" shall mean any competitive lines of business, services or related activities of a type or character engaged in, or substantially similar to those engaged in, by the Company during the last five (5) years of my employment with Company (or as may be contemplated to be engaged in by the Company at the time of termination of my employment with the Company), to the extent that I was involved in, was exposed to, or otherwise had knowledge of Confidential Information related to such lines of business, services, or related activities as a result of my employment with the Company. Without limitation, to the extent that I was involved in, was exposed to, or otherwise had knowledge of Confidential Information related to such lines of business, services, or related activities as a result of my employment with the Employer, such "Company Business" shall include any line(s) of business competitive with the Company involving or related to: (a) land development services from site evaluation and due diligence through project completion, including without limitation civil and consulting engineering, land surveying, project management, environmental consulting, landscape architecture, LEED and LID civil design consulting, permitting services, and planning, and (b) any and all other lines of business conducted by the Company in which Employee was involved in or exposed to during Employee's employment with the Employer

   (d)    "Person" shall mean any natural person, firm, corporation, partnership, limited liability company, association, company or other individual or entity.

12.    **DISCLOSURE OF THIS AGREEMENT.** I agree that at the cessation of employment with the Employer for any reason, I shall inform the Employer in writing of the name and address of my new employer or other business association prior to commencement of that new employment or business relationship if my subsequent employer or other business association is with either: (i) a customer, supplier or vendor of either Company or Employer, or (ii) a Person or entity who performs services included in or related to the definition of the Company Business. I further agree to give notice of this Agreement, including the restrictions contained herein. The parties agree that the Company may need to, and is authorized by me, to forward a copy of this Agreement to a future employer, prospective employer, partner, or other business associate of mine if the Employer in its sole discretion determines that there is or may be a risk or threat of a potential or actual breach of this Agreement by me, or in the event of a related claim, litigation, or court order.

13.    **WAIVER OF JURY TRIAL.** TO THE FULLEST EXTENT PERMITTED BY LAW, THE COMPANY AND THE EMPLOYEE, BY EXECUTION OF THIS AGREEMENT, WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT.

4

14.  **ADVICE OF COUNSEL.**  I expressly state that I have been afforded the opportunity and sufficient time to review this Agreement with counsel, legal and otherwise, of my choice prior to execution of this Agreement by me.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the date indicated next to each party's signature, with this Agreement effective upon the date the last party executes this Agreement.

Maximiliano Bustos

BOHLER ENGINEERING PA, LLC

By: _Lewis Sidorsky_

Dated: 08/17/17

Dated: 8/29/17

ACKNOWLEDGMENT

State of PA

County of PENNSYLVANIA

On Aug. 17, 2017, before me, personally appeared [Maximiliano Bustos] personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the foregoing instrument and he, being by me duly sworn, acknowledged, deposed and said that such instrument was made, signed, sealed and delivered by him as his voluntary act and deed.

WITNESS my hand and official seal.

Signature _Katherine Palmer_

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
KATHERINE PALMER, Notary Public
City of Philadelphia, Phila. County
My Commission Expires February 23, 2020

# Exhibit "C"



**VIA FEDEX**

July 6, 2018

Maximiliano Bustos
2207 Walnut Street
Apt. 3M
Philadelphia, PA 19103

Re:    Bohler Engineering PA, LLC - Employment
       Separation/Confidentiality and Non-Disclosure
       Agreement

Dear Max:

In connection with your separation from employment with Bohler Engineering PA, LLC (the "Company" or the "Firm"), we write to remind you of your continuing obligation to the Company as specifically set forth in the Confidentiality and Non-Disclosure Agreement (the "Agreement"), with an execution date of August 29, 2017 and those set forth in the Employee Handbook. In addition to your obligations as set forth in the Agreement, there are potential common law obligations and restrictions that you should also consider in your future endeavors and with respect to your future professional occupation(s), which limit and restrict the information you are permitted to convey and/or rely upon. We have enclosed a copy of your signed Agreement for your reference.

Of particular note, paragraph 3 defines the Firm's Confidential Information and specifically describes the protections afforded to such Confidential Information, including the limitations and clear restrictions on your use and disclosure of such Confidential Information. Paragraph 4 prohibits you from disparaging the Company in any written or oral statements. Paragraph 5 articulates restrictions regarding your use/and return of Company property.

It is our hope that this reminder will serve both our interests as you pursue a new career direction. We wish you the best in your future endeavors and trust that you will conform your future activities in a manner consistent with the Agreement, the Employee Handbook and common law.

Should you have any questions, at all, please do not hesitate to contact me.

Very truly yours,


Jane Leopold-Leventhal, Esquire
Chief Legal Counsel
T: (215) 996-9100
M: (215) 262-4319
jleventhal@bohlereng.com


Enclosure: Confidentiality and Non-Disclosure Agreement

Exhibit "D"

Bohler PA
JUNE 2018 Services - 1,004 Prebills

Handwritten at top: (A) Transfer  (B) Consult  (C) Move

| PM | BR | Project | Project Title | Client | B/H/K/T | Effort | Transfer To | Notes |
|---|---|---|---|---|---|---|---|---|
| Cressman, George | | | | | | | N/A | Proposal |
| Cressman, George | | | | | | | N/A | Proposal |
| Cressman, George | | | | | | | C | |
| Cressman, George | | | | | | | A | |
| Cressman, George | | | | | | | N/A | Proposal |
| Cressman, George | | | | | | | N/A | Proposal |
| Cressman, George | | | | | | | N/A | Proposal |
| Cressman, George | | | | | | | A | |
| Cressman, George | | | | | | | A | |
| Cressman, George | | | | | | | A | |
| Cressman, George | | | | | | | A | |
| Cressman, George | | | | | | | A | |
| Cressman, George | | | | | | | N/A | |
| Cressman, George | | | | | | | N/A | |
| Cressman, George | | | | | | | A | |
| Cressman, George | | | | | | | N/A | Proposal |
| Cressman, George | Cressman, George | | | | | | N/A | Proposal |
| Cressman, George | Cressman, George | | | | | | A | Proposal |
| Cressman, George | Cressman, George | | | | | | A | lost won |
| Cressman, George | Cressman, George | | | | | | N/A | proposal |
| Cressman, George | Cressman, George | | | | | | A | |
| Cressman, George | Cressman, George | | | | | | B | Project Complete |
| Cressman, George | Cressman, George | | | | | | | |
| Cressman, George | Cressman, George | | | | | | A | Project on hold |
| Cressman, George | Cressman, George | | | | | | | " " |
| Cressman, George | Cressman, George | | | | | | | |
| Cressman, George | Cressman, George | | | | | | A | |
| Cressman, George | Cressman, George | | | | | | N/A | |
| Cressman, George | Cressman, George | | | | | | A | Proposal |
| Cressman, George | Cressman, George | | | | | | A | Project Complete |
| Cressman, George | Cressman, George | | | | | | N/A | Proposal |
| Cressman, George | Cressman, George | | | | | | N/A | Proposal |
| Cressman, George | Cressman, George | | | | | | B,C | |
| Cressman, George | Cressman, George | | | | | | C | |
| Cressman, George | Cressman, George | | | | | | C | |
| Cressman, George | Cressman, George | | | | | | B | |
| Cressman, George | Cressman, George | | | | | | N/A | Proposal |
| Cressman, George | Cressman, George | | | | | | B or C | |
| Cressman, George | Cressman, George | | | | | | B or C | |
| Cressman, George | Cressman, George | | | | | | N/A | |
| Cressman, George | Cressman, George | | | | | | C | Project Complete |
| Cressman, George | Cressman, George | | | | | | A | Project Complete |
| Cressman, George | Cressman, George | | | | | | C | Project Complete |

Bohler PA
JUNE 2018 Services - 1,004 Prebills

| PM | BR | Project | Project Title | Client | B/H/K/T | Effort | Transfer To | Notes |
|---|---|---|---|---|---|---|---|---|
| Cressman, George | Cressman, George | | | | | | to C | |
| Cressman, George | Cressman, George | | | | | | B or C | |
| Cressman, George | Cressman, George | | | | | | C | |
| Cressman, George | Cressman, George | | | | | | C | |
| Cressman, George | Cressman, George | | | | | | C | Project Complete |
| Cressman, George | Cressman, George | | | | | | C | it it |
| Cressman, George | Cressman, George | | | | | | | |
| Cressman, George | Cressman, George | | | | | | B or C | |
| Cressman, George | Cressman, George | | | | | | B or C | |
| Cressman, George | Cressman, George | | | | | | B or C | |
| Cressman, George | Cressman, George | | | | | | B or C | |
| Cressman, George | Cressman, George | | | | | | B or C | |
| Cressman, George | Cressman, George | | | | | | N/A | |
| Cressman, George | Bustos, Maximiliano | | | | | | A | Proposal |
| Cressman, George | Bustos, Maximiliano | | | | | | C | Project Complete |
| Cressman, George | Bustos, Maximiliano | | | | | | B or C | |
| Cressman, George | Bustos, Maximiliano | | | | | | B or C | |
| Cressman, George | Bustos, Maximiliano | | | | | | N/A | Proposal |
| Cressman, George | Bustos, Maximiliano | | | | | | B or C | |
| Cressman, George | Bustos, Maximiliano | | | | | | B or C | |
| Cressman, George | Bustos, Maximiliano | | | | | | B or C | |
| Cressman, George | Bustos, Maximiliano | | | | | | | |
| Cressman, George | Bustos, Maximiliano | | | | | | B or C | |
| Cressman, George | Bustos, Maximiliano | | | | | | B or C | |
| Cressman, George | Bustos, Maximiliano | | | | | | B or C | |
| Cressman, George | Bustos, Maximiliano | | | | | | B or C | |
| Cressman, George | Bustos, Maximiliano | | | | | | B or C | |
| Cressman, George | Bustos, Maximiliano | | | | | | B or C | |
| Cressman, George | Bustos, Maximiliano | | | | | | B or C | |
| Cressman, George | Bustos, Maximiliano | | | | | | B or C | |

Exhibit "E"

**Subject:** FW: Project Status 06/24
**Date:** Wednesday, July 18, 2018 at 2:49:23 PM Central Daylight Time
**From:** George C. Cressman Jr.
**To:** 'cressmanjr@live.com'

**From:** Cornelius Brown
**Sent:** Wednesday, July 18, 2018 3:48 PM
**To:** George C. Cressman Jr. <gcressman@bohlereng.com>
**Cc:** ███████████████████████████████████████
**Subject:** Re: Project Status 06/24

Thanks George

Cornelius Brown
Bohler Engineering

On Jul 18, 2018, at 3:46 PM, George C. Cressman Jr. <gcressman@bohlereng.com> wrote:

> Hello Cornelius,
>
> Here is the latest update.  Sorry for any delay, but there was a lot to update.
>
> George
>
> **From:** George C. Cressman Jr.
> **Sent:** Monday, June 25, 2018 9:30 AM
> **To:** ███████████████████████████
> **Cc:** Max Bustos <mbustos@bohlereng.com>
> **Subject:** Re: Project Status 06/24
>
> I will follow up with Jon and make sure everything is final. Thanks
>
> Sent from my iPhone
>
> On Jun 25, 2018, at 8:49 AM, ███████████████████████████████ > wrote:
>
>> Max,
>>
>> In regards to ████████████████████████████████████████████████
>> ████████████████████████████████████████████████████████████
>> ████████████████████████████████████████████████████████████

Let me know if you have any more questions.

Thanks,

█████████████████

**From:** Max Bustos
**Sent:** Sunday, June 24, 2018 11:55 AM
**To:** George C. Cressman Jr. <gcressman@bohlereng.com>
**Cc:** ████████████████████████████████████

**Subject:** Project Status 06/24

**PROJECT TRACKER (update 06/24)**



**ACTIVE PROJECTS**

1.  ████████████████████████████████
    - █████████████████████████
    - █████████████████████████
    - █████████████████████████
    - █████████████████████████

2.  ████████████████████████████████
    - █████████████████████████
    - █████████████████████████
    - █████████████████████████
    - █████████████████████████
    - █████████████████████████

3.  ████████████████████████



4.

5.

6.

7.



8.

9.













**PROJECTS THAT REQUIRE SURVEY ONLY-GC**









**NEW PROJECTS:**



**LOST/ DEAD PROJECT:**









**COMPLETED PROJECT:**



